[No. B024082. Second Dist., Div. Two. August 11, 1988.]

MILTON OKUN, Plaintiff and Respondent, v.
PETER MORTON et al., Defendants and Appellants.

COUNSEL

Rosenfeld, Meyer & Susman, Harry B. Swerdlow and James L. Seal for Defendants and Appellants.

Bergman & Wedner, Gregory A. Wedner and Gregory M. Bergman for Plaintiff and Respondent.

OPINION

COMPTON, J.—This litigation arises out of a dispute over the interpretation of an agreement between Milton Okun (plaintiff) and Peter Morton (defendant) which, at its inception, contemplated the development of a restaurant and commercial enterprise known as the Hard Rock Cafe (also Hard Rock). Although the venture proved highly successful, the parties found themselves at odds concerning provisions in the contract covering the exploitation of future business opportunities.

As a result, plaintiff initiated this action for specific performance, declaratory relief, and damages. Alleging that the disputed portion of the agreement was too vague to be enforceable, defendant cross-complained for recision, damages, and other forms of equitable relief. Following a nonjury trial, the court granted plaintiff specific performance and awarded him a total of $354,325 in damages for fraud, breach of contract, and tortious breach of contract. The judgment as rendered also specified the manner in which the parties were to share in all business opportunities utilizing the Hard Rock name and format. This appeal by defendant follows.

Plaintiff first met defendant when the two were residing in England in the early 1970's. Defendant and a partner, Isaac Tigrett, were operating a popular local restaurant and tourist attraction known as the Hard Rock Cafe. Plaintiff contacted defendant and inquired about investing in the

business. Defendant declined plaintiff's offer but indicated that he contemplated expanding his business to the United States and would contact plaintiff if an opportunity for participation in the venture became available.

In 1978, plaintiff having returned to this country, was contacted by defendant who indicated that he was looking for investors willing to back a restaurant in the Los Angeles (also L.A.) area. Plaintiff and defendant were successful in opening and operating a restaurant known as Morton's, patterned after another restaurant in London but more modest in size and concept than the Hard Rock Cafe.

In December 1981, defendant located a site suitable for the Hard Rock Cafe and began circulating a private placement memorandum to potential limited partners for the purpose of raising $850,000 in capital.[1]

Earlier that year, defendant had entered into an agreement with his London partner, Isaac Tigrett, in an attempt to settle a long-standing dispute concerning their respective rights to use the restaurant's name and trademark in the United States. Memorialized in a July 1981 telex, the parties agreed that defendant was to have the exclusive right to use the Hard Rock name and logo in California, Arizona, and Illinois while Tigrett was to have rights in New York, Florida, and Texas. The remaining states were available for exploitation on a "first come, first serve" basis. Although the agreement appeared unambiguous on its face, both defendant and Tigrett continued to argue over the meaning of various terms, including the length of time each would be bound by its provisions.

The private placement memorandum circulated by defendant failed to mention even the existence of that dispute. That document merely noted that defendant was the sole shareholder of the Hard Rock Cafe Corporation (HRC), and that he had personally licensed HRC to use the Hard Rock name.[2] The memorandum further represented that "the General Partner

---

[1] The memorandum described the concept for the restaurant as follows: "Mr. Morton, the originator of the Hard Rock Cafe in London, intends to create a restaurant which will appeal, through decor, menu and service, to a broad range of appetites and ages—'a kids' restaurant for adults.' Although the restaurant will not be a duplicate of the Hard Rock Cafe in London, the theme, decor and menu will be substantially similar. The decor will be based upon American roadside diners of the 1950's. The menu will offer 'traditional American food,' at 'affordable' prices. Beer, wine and liquor will be offered, as well. . . ."

[2] Pursuant to the terms of the memorandum, the restaurant itself was to be owned and operated by a partnership consisting of the Hard Rock Cafe Investors, Ltd., a limited partnership, and HRC, the general partner doing business as Southland Development and Incentive Corporation. Although both the general and limited partners were to share equally in the ownership of the restaurant, HRC was solely responsible for "all decisions concerning the development, ownership, operation and any future sale of the Restaurant, and for the operations and management of the [limited] Partnership."

[HRC] and Mr. Morton have the *unrestricted right* to develop future restaurants, including such as may bear the Hard Rock Cafe name or otherwise embody the concepts involved in the restaurant, for their own accounts or for the account of others. . . ." (Italics added.) These statements notwithstanding, the licensing agreement appended to the memorandum did disclaim defendant's right to use or license the Hard Rock name as follows: "Licensor [Morton] makes no representation or warranties that it has the right to use or license the name 'Hard Rock Cafe' and Licensor shall not be liable to Licensee [HRC] for any causes of action, claims, damages, costs or expenses of any nature whatsoever which Licensee may suffer or incur as a result of its use of said name pursuant to this Agreement."

Plaintiff received a copy of the memorandum but initially rejected the proposal. Sometime later, after it became apparent that HRC could not meet its capital contribution obligations as specified in the private placement memorandum, defendant attempted to rekindle plaintiff's interest in the business by offering him stock in the general partnership and the right to participate in other opportunities utilizing the Hard Rock name.

In the negotiations which followed, plaintiff demanded a 30 percent interest in HRC in exchange for his payment of $100,000 to the limited partnership. He also insisted on receiving 20 percent of the fees earned by defendant for operating the restaurant despite his expressed desire to have no role in the management of the business. When defendant, through his attorney, Gary Hampar, balked at the proposal, plaintiff agreed to accept a 20 percent interest in the general partnership so long as his financial liability for the venture was confined to narrowly defined circumstances. The parties further agreed that plaintiff's obligation to pay 100 percent of HRC's contribution to the limited partnership was unique, and that in future ventures he would be responsible only for capitalization equal to his shareholder interest.

Although during the course of the negotiations neither defendant nor Hampar mentioned that there were any limitations on the use of the Hard Rock name, they did emphasize the possible future investments that could be anticipated and the markets which existed for the opening of other similar restaurants.

The parties executed the agreement which, on March 2, 1982, provided that HRC was to be capitalized for $5,000, $1,000 of which was to be provided by plaintiff in exchange for a 20 percent interest in the general partner. Plaintiff further agreed to advance $99,000 to HRC, which amount would be contributed to capital prior to the closing of the limited partnership offering. In addition to receiving 20 percent of the management fees

paid defendant as compensation for his services at the L.A. Hard Rock location, plaintiff's liability for future financial contributions to the venture was limited to 25 percent of defendant's contributions, not to exceed $50,000.[3]

Paragraph 9 of the agreement (hereafter Paragraph 9), entitled "Business Opportunities," read in pertinent part as follows: "All business opportunities which arise in connection with the business of HRC, the partnership or that which utilizes the name and mark 'HARD ROCK CAFE ' must be offered to HRC. If HRC does not avail itself of such opportunity, we shall then have the right to exploit such opportunity together in a manner mutually agreeable in the same ratio which we currently hold stock in HRC. If you elect not to participate in such opportunity after reasonable notice, I shall be free to exploit such opportunity in any manner I choose."

In addition to his 20 percent ownership in HRC, plaintiff purchased two limited partnership units in the L.A. Hard Rock and encouraged his business associates to do the same. The restaurant itself opened at its Beverly Center location in October 1982, and proved to be a commercial success.

As a result, defendant went forward with plans to exploit the San Francisco market in a manner similar to that used in Los Angeles. In April 1983, he circulated a private placement memorandum for the purpose of soliciting investors in a new limited partnership which, in conjunction with a general partner, would own and operate a second Hard Rock Cafe. Defendant, however, decided against using HRC as the general partner and, instead, formed the Hard Rock Cafe Corporation II (HRC II). When plaintiff became aware of this development he was informed by defendant's attorneys that HRC actually was the general partner and that HRC II had been organized solely to minimize the tax consequences of the venture. At the same time, he was assured that HRC and HRC II would be functionally identical insofar as his ownership interest was concerned.

In accordance with the terms of the L.A. Hard Rock limited partnership deal, the investors in that operation were given the right of first refusal to participate in the San Francisco venture at $35,000 per unit (i.e., a 1⅓

---

[3] Paragraph 8, identified as "Sharing of Liabilities," provided: "In the event HRC makes additional financial contributions to the partnership above and beyond the $100,000 indicated in paragraph 6, then, to the extent that it is necessary for me [defendant] to advance money to HRC to enable HRC to make such financial contributions, you will be required to make financial contributions to HRC in the amount of 25% of the contributions that I make, provided that: [¶] (i) I will furnish proof to you of my contribution; [¶] (ii) the total contributions to be required of you, will in no event, exceed $50,000; and [¶] (iii) the contributions to HRC will be on the same terms and conditions as my contributions. [¶] After you have been furnished with the above information, your contribution must be made within five (5) days."

percent interest). The private placement memorandum itself referred to defendant as the "majority stockholder" in HRC II and indicated that he had committed to obtain a third party loan up to a maximum of $100,000 and/or additional operating expenses not to exceed $50,000. The general partner's financial commitment to the venture, however, was expressly limited to its contribution of $10,000 for the capitalization of HRC II. Nevertheless, the limited partnership offering was expected to generate approximately $1.2 million.

Defendant subsequently offered plaintiff a 20 percent interest in HRC II for $2,000 and retained the remaining shares (i.e., 80 percent) for himself. Before the transaction was consummated, however, defendant's attorney, Philip Adler, advised plaintiff in August 1983 that defendant had instituted a lawsuit in federal district court against his partner in the London Hard Rock, Tigrett, over the parties' respective rights to use the Hard Rock name in the United States. In view of his asserted right to participate in future business opportunities utilizing the Hard Rock trademark, plaintiff was asked to contribute 20 percent of the legal fees generated by the litigation.[4] Although he was surprised and dismayed by Adler's disclosures, plaintiff eventually agreed to pay the fees as requested.[5] That matter resolved,

---

[4] During Adler's initial discussion with plaintiff he intimated that plaintiff's right to participate in future business opportunities was directly related to his payment of fees in the trademark litigation. This position again was advanced the following month in a letter written by Adler to plaintiff's counsel: "Enclosed is a copy of the March 2, 1982 Agreement. . . . The first paragraph of paragraph 9, page 3, would appear to be dispositive of the issues at hand. As we read this paragraph, the rights and claims which are the subject matter of the *Morton* v. *Tigrett* litigation represent a very substantial business opportunity involving the use and exploitation of the Hard Rock Cafe name throughout the United States. We have recommended to [plaintiff] and [defendant] that this opportunity be declined by 'HRC' which is the corporate general partner of the Los Angeles Hard Rock Cafe, and that the opportunity be exploited at the individual level, as contemplated by the agreement.

"Accordingly, among other things, Milt has been tendered the right to participate in the costs of this litigation. . . . To the extent that the litigation is successfully resolved, [plaintiff] and [defendant] would then proceed to 'exploit such opportunity together in a manner mutually agreeable in the same ratio which (they) currently hold stock in HRC.

"[Plaintiff] is under no obligation to fund a pro rata portion of the expenses involved in this litigation, or the other projects currently or recently in process. As similarly contemplated by the agreement, if [plaintiff] does not elect to participate in this opportunity, [defendant] will be free . . . to exploit the rights to the Hard Rock Cafe name in any manner that he chooses, solely for his own account. . . .

"Since the subject matter of the litigation potentially influences the other projects under consideration . . . [plaintiff's] decision with respect to the litigation will affect his right to participate in (and fund) these other projects."

[5] Before the litigation was settled in June 1985, plaintiff paid in excess of $35,000 fees and related costs. Under the terms of the settlement agreement, defendant was given the right to use the Hard Rock trademark in all states west of the Mississippi River except Texas, including the cities of Chicago, New Orleans, and Houston. Tigrett was given a similar right in all states east of the Mississippi and Texas. The settlement also established the Hard Rock Cafe

plaintiff finally accepted defendant's offer for a 20 percent share of HRC II in October 1983, after earlier purchasing two limited partnerships in the San Francisco operation.

Some eight months later, in June 1984, plaintiff again was offered the opportunity to become a 20 percent shareholder in HRC III, formed by defendant for the purpose of opening a third restaurant tentatively planned for Houston. At the same time, he was asked to cosign with defendant a lease guaranty for $274,000 in kitchen equipment needed for the almost completed San Francisco Hard Rock. Declining to do so, plaintiff explained that the parties' March 1982 agreement did not obligate him to contribute postformation operating costs and that such expenses were solely the responsibility of the limited partners. Confronted with plaintiff's refusal, defendant eventually guaranteed the total value of the equipment under the lease.[6]

Plaintiff subsequently tendered his check in the amount of $3,150 for a 20 percent share of HRC III, and agreed not to purchase more than one limited partnership in the new venture. By March 1985, however, the deal was foundering and defendant needed $900,000 in additional capital to develop the Houston site. Through counsel, defendant therefore demanded that plaintiff guarantee 100 percent of that sum as a condition of his continued participation in the project. Plaintiff responded that in accordance with the March 1982 agreement he already had discharged his obligations to HRC III, but that, in any event, he would contribute 20 percent of the amount requested if defendant advanced 80 percent. Refusing to do so, defendant solicited the existing limited partners for a pro rata contribution to the venture. When that proposal was rejected, defendant rescinded the offering in its entirety and refunded the limited partners' investments.

Even before the aborted Houston venture, defendant had experienced cash flow problems which led him to seek plaintiff's assistance. Although the parties were unable to agree on the terms of a loan or other similar arrangement, defendant proposed restructuring the March 1982 agreement so as to limit plaintiff's participation in future restaurant operations or other projects utilizing the Hard Rock name. When plaintiff initially agreed to postpone taking preferential distributions due him and to relinquish rights in a motion picture based on the restaurant concept, among other concessions, defendant suggested that they undertake a complete revision of the original agreement. While these negotiations were continuing, however,

---

Licensing Corporation, jointly owned by defendant and Tigrett, to control nonrestaurant licensing of the Hard Rock name throughout the United States.

[6] At trial, the parties disputed whether plaintiff also refused to cosign a $300,000 loan obtained by defendant for unexpected structural work at the San Francisco location.

defendant began finalizing his plans for opening a Hard Rock Cafe in Chicago. In December 1984, he advised plaintiff that he intended to exclude him from participating in that venture. When plaintiff protested, defendant, through counsel, proposed that they alone provide the capital for the restaurant, a total of $3 million, and that plaintiff contribute $600,000 for a 20 percent share. Plaintiff's participation also was made contingent on his accepting "unlimited personal liability, to the same extent as defendant, with respect to any third party financing, leases and the like."[7] In February 1985, some two months before rejecting defendant's request for an additional $900,000 in connection with the Houston venture, plaintiff refused the terms and instead offered to participate in accordance with the 1982 agreement. Defendant, in turn, rejected that offer and proceeded with the development of the Chicago site as planned. Defendant also continued to develop restaurants in Houston and Honolulu without offering plaintiff a general partnership interest in either venture.

In a lengthy statement of decision, and subsequent judgment, the trial court concluded that the March 1982 agreement was nonillusory, specifically enforceable, and binding between the parties and, as such, entitled plaintiff to participate in all business opportunities using the Hard Rock name commensurate with his 20 percent ownership of HRC.[8] The court further found that defendant: (1) committed fraud by his failure to disclose the limitations on his right to use and exploit the Hard Rock trademark prior to the execution of the March agreement; (2) breached the covenant of good faith and fair dealing by attempting to limit and/or exclude plaintiff from participating in various business opportunities utilizing the Hard Rock name; (3) breached the March agreement by withholding profit and management fee distributions due plaintiff as an HRC shareholder and as a party to the contract; and (4) tortiously breached the March agreement by

---

[7] Defendant's legal counsel further advised plaintiff that if he chose to participate in the venture, even on the terms proposed, defendant reserved the right to sue him for lost profits and interference with prospective economic advantage.

[8] The judgment decreed in pertinent part the parties' rights and obligations under the March agreement as follows: "Under the March agreement, Milton Okun acquired and now owns (a) one-quarter (¼) of Peter Morton's exploitation rights in all manner of ventures which utilize the Hard Rock Cafe name or derivation thereof ('exploitation rights'); and (b) participation rights in all business opportunities, present and future, which used or are using the Hard Rock Cafe name or derivation thereof, up to and including a one-quarter (¼) ownership interest in each and every of such opportunities ('participation rights') held by Peter Morton and Hard Rock Cafe on March 2, 1982. In accord with such exploitation rights and in order for Milton Okun to exercise his participation rights and acquire his ownership interest in each future business opportunity using the Hard Rock Cafe name or derivation thereof, Milton Okun must pay a sum or guarantee an obligation which represents one-fourth (¼) of the total funds or total contractual obligation which Peter Morton is personally obligated to pay or guarantee and actually pays or guarantees to acquire his ownership interest in such business opportunity. . . ."

denying in bad faith the existence of contractual terms giving plaintiff a right to participate in ventures other than HRC and the Los Angeles restaurant.

Beyond awarding plaintiff in excess of $360,000 in general and punitive damages, the judgment ordered that he receive a proportionate share of stock in ventures from which he had been wrongfully excluded and decreed the manner in which he was to be allowed to participate in all future investments.

■ On this appeal, defendant first argues that Paragraph 9 of the March 1982 agreement providing for joint exploitation of future business opportunities on a "mutually agreeable basis," was merely an unenforceable "agreement to agree" which cannot support a decree of specific performance. Plaintiff counters, however, that any ambiguity in the meaning of the contract may be cured by reference either to parol evidence of the events preceding the execution of the agreement or to the subsequent conduct of the parties.

■ In determining what the parties agreed upon and intended by their agreement, we apply the well-settled rule that the interpretation of a written instrument generally presents a question of law for this court to determine anew. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; see also *Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 [204 Cal.Rptr. 435, 682 P.2d 1100]; *Klingele* v. *Engelman* (1987) 192 Cal.App.3d 1482, 1485 [238 Cal.Rptr. 199].) Even where extrinsic evidence was offered in the trial court, a reviewing court is not bound by the trial court's findings if the extrinsic evidence is not in conflict, is not substantial, or is inconsistent with the only interpretation to which the instrument is reasonably susceptible. (*Pasadena Police Officers Assn.* v. *City of Pasadena* (1983) 147 Cal.App.3d 695, 707 [195 Cal.Rptr. 339]; *United California Bank* v. *Maltzman* (1974) 44 Cal.App.3d 41, 49 [118 Cal.Rptr. 299]; *Robinson & Wilson, Inc.* v. *Stone* (1973) 35 Cal.App.3d 396, 407 [110 Cal.Rptr. 675].) Here, of course, parol evidence was admitted to explain the context in which the 1982 agreement arose and the parties' conduct following the execution of the contract which cast light on their original intent and the meaning of Paragraph 9. Although defendant and plaintiff dispute the inferences to be drawn from this evidence, the evidentiary facts themselves are not in substantial conflict. We therefore review the pertinent provisions of the contract in the context of the extrinsic evidence and make an independent determination of the meaning of the agreement. (*Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 315 [231 Cal.Rptr. 820]; *Medical Operations Management,*

*Inc.* v. *National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 893 [222 Cal.Rptr. 455].)

A contract which leaves an essential element for future agreement of the parties is usually held fatally uncertain and unenforceable. *(Coleman Engineering Co.* v. *North American Aviation, Inc.* (1966) 65 Cal.2d 396, 405 [55 Cal.Rptr. 1, 420 P.2d 713]; *Robinson & Wilson, Inc.* v. *Stone, supra,* 35 Cal.App.3d at p. 409; *Roberts* v. *Adams* (1958) 164 Cal.App.2d 312, 314 [330 P.2d 900].) The general rule was explained in *Ablett* v. *Clauson* (1954) 43 Cal.2d 280 [272 P.2d 753], as follows: "'Although a promise may be sufficiently definite when it contains an option given to the promisor or promisee, yet if an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Since either party by the terms of the promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise.' [Citation.] The rule is well established in this state [citations], and, in conformity with the weight of authority in other states [citation], it has been held that an option agreement which leaves an essential term to future agreement is not enforceable. [Citations.]" *(Id.* at pp. 284-285; see also *Etco Corp.* v. *Hauer* (1984) 161 Cal.App.3d 1154, 1158 [208 Cal.Rptr. 118].)

Although an agreememt cannot be specifically enforced unless the terms are "sufficiently certain to make the precise act which is to be done clearly ascertainable" (Civ. Code, § 3390, subd. 5), the modern trend of the law favors carrying out the parties' intentions through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty. *(California Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496]; *Larwin-Southern California, Inc.* v. *JGB Investment Co.* (1979) 101 Cal.App.3d 626, 641 [162 Cal.Rptr. 52]; *Burrow* v. *Timmsen* (1963) 223 Cal.App.2d 283, 288 [35 Cal.Rptr. 668, 100 A.L.R.2d 544].) "The defense of uncertainty has validity only when the uncertainty or incompleteness of the contract prevents the court from knowing what to enforce." *(Hennefer* v. *Butcher* (1986) 182 Cal.App.3d 492, 500 [227 Cal.Rptr. 318].) At bottom, "[i]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left. [Fn. omitted.]" (1 Corbin on Contracts (1963) § 95, p. 400.)

With the foregoing standards in mind, we are of the view that the provisions of Paragraph 9 which defendant characterizes as fatally uncertain, are either sufficiently certain on their face, or were made sufficiently

certain by the introduction of extrinsic evidence at trial. Based upon our independent review of the record, we think it clear that the 1982 agreement gave plaintiff the right to participate in all future business opportunities utilizing the Hard Rock name in consideration of his initial investment of $100,000 in HRC. As the facts plainly demonstrate, defendant needed plaintiff's contribution at the inception of the venture in order to satisfy HRC's obligation to the limited partnership. Plaintiff, in turn, was afforded the opportunity to share in all future endeavors to the extent of his 20 percent ownership interest in HRC. That option, however, was made contingent upon HRC's rejection of any such proposed "opportunity." Plaintiff, of course, received other benefits under the agreement, including preferential repayment of his $99,000 contribution to the general partner and a share of defendant's management fees. He further obligated himself to advance additional funds, up to a maximum of $50,000, in a one-to-four ratio with defendant under certain delineated circumstances.

Considered as a whole, the foregoing terms were sufficient to establish from the outset the ways in which future ventures were to be financed, owned, and operated by the parties. The fundamental structure of all such undertakings was to be based on the 20/80 ratio established for the creation of the L.A. Hard Rock. This essential term effectively defined the extent of the parties' capital contributions and their right to participate in all manner of future investment schemes commensurate with their ownership interest in HRC. Although the agreement admittedly does not deal in specifics, neither law nor equity requires that every term and condition be set forth in the contract. (*King* v. *Stanley* (1948) 32 Cal.2d 584, 588 [197 P.2d 321]; *Burrow* v. *Timmsen, supra,* 223 Cal.App.2d at p. 288.) In light of the fact that neither defendant nor plaintiff could predict with any degree of certainty the success of the Los Angeles operation, it is not surprising that Paragraph 9 was drafted broadly enough to accommodate changing circumstances and unforeseen developments. Because of defendant's expertise, however, he was left with the discretion to formulate and structure the ownership for each venture so long as he maintained the 20/80 ratio. That he believed himself bound by the agreement needs little discussion. Suffice it to say that the organizational structure and development of HRC II and III alone evidence defendant's manifest intent to abide by the terms of Paragraph 9.

Defendant nevertheless argues that the agreement is uncertain in several important particulars, including the manner in which liabilities are to be shared between the parties and the effect of offering other investors the opportunity to participate in any given deal. He also points out that there is no provision describing when and how he must offer plaintiff the option to invest. We do not regard any of these omissions of detail as a defect which

necessarily renders Paragraph 9 unenforceable. ■ Even when the uncertainty of a written contract goes to " 'the precise act which is to be done' (Civ. Code, § 3390), extrinsic evidence is admissible to determine what the parties intended. [Citations.] It is only when the extrinsic evidence fails to remove the ambiguity that specific performance must be refused." (*Crescenta Valley Moose Lodge* v. *Bunt* (1970) 8 Cal.App.3d 682, 689 [87 Cal.Rptr. 428]; see also *Hennefer* v. *Butcher, supra,* 182 Cal.App.3d at p. 499.) ■ Here, the conduct of the parties subsequent to the execution of the 1982 agreement and before any controversy had arisen, is persuasive evidence in determining the meaning of Paragraph 9. (See *Bohman* v. *Berg* (1960) 54 Cal.2d 787, 795 [8 Cal.Rptr. 441, 356 P.2d 185]; *Davies Machinery Co.* v. *Pine Mountain Club, Inc.* (1974) 39 Cal.App.3d 18, 26 [113 Cal.Rptr. 784].)

Between the formation of HRC II in 1983 and the Chicago offering in 1985, both defendant and plaintiff acted in strict accord with the provisions of the contract. This is not to say that they did not dispute the extent of their responsibilities under Paragraph 9, they did. But regardless of those disagreements, defendant continued to offer to plaintiff the opportunity to become a 20 percent participant in all ventures utilizing the Hard Rock name. Plaintiff, in turn, agreed to contribute 20 percent of the capital requirements of those operations. The presence or absence of other investors had little effect on the parties' dealings in this respect. At most, the participation of other investors merely served to reduce the capital demands placed on the parties in proportion to their ownership interest in the venture. Under these circumstances, defendant's concern over his ability to structure future investment opportunities which rely on the participation of others is simply misplaced.

While it may be true that the parties hotly disputed plaintiff's obligation to contribute to postformation expenses, we think it reasonable to imply, as did the trial court, that the agreement requires him to pay a sum or guarantee an obligation equal to one-quarter the amount so contributed by defendant. This construction is consistent with those provisions of the contract which compel plaintiff, under certain circumstances, to advance to HRC 25 percent of what defendant contributes (see fn. 4, *ante*). Viewed in the context of plaintiff's testimony at trial that he had never rejected paying one-fourth of what defendant was required to pay to exploit the Hard Rock name, we can only conclude that the parties intended to be bound by this term in all their dealings. Contrary to the argument advanced by defendant, plaintiff is not a general partner who is jointly responsible for all partnership obligations (see Corp. Code, § 15015, subd. (b)), but rather a shareholder in a corporate general partnership who is liable only to the extent of his obligations under the contract.

Although we think it clear that defendant retains the discretion under the contract to determine the structure of any business venture designed to exploit the Hard Rock name, such discretion must be exercised in good faith. ■ "It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing. [Citations.] Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158]; *Mitchell* v. *Exhibition Foods, Inc.* (1986) 184 Cal.App.3d 1033, 1043 [229 Cal.Rptr. 535]; *Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155, 1169 [226 Cal.Rptr. 820].) Although the precise contours of the covenant depend upon the nature of the contract, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." (*Cal. Lettuce Growers* v. *Union Sugar Co., supra,* 45 Cal.2d 474, 484; see also *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 923 [216 Cal.Rptr. 345, 702 P.2d 503]; *Automatic Vending Co.* v. *Wisdom* (1960) 182 Cal.App.2d 354, 357 [6 Cal.Rptr. 31].) It was this particular aspect of the good faith requirement which the trial court had in mind when it concluded that Paragraph 9 requires the parties to "conduct themselves in good faith, and in a manner consistent with the original circumstances involved in the execution of the Agreement." We find nothing peculiar or particularly onerous about this directive. As he did in relation to HRC II and HRC III, defendant must structure future ventures in a manner which respects plaintiff's right to participate under the contract and does nothing to unduly burden the exercise of that right. To do otherwise would deprive plaintiff of "the benefits of the agreement," contrary to the covenant of good faith and fair dealing. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at p. 768.) This covenant is, of course, reciprocal and requires plaintiff to fulfill his financial obligations under the agreement, including the assumption of his proportionate share of liabilities, without undue delay.

■ Defendant asserts, however, that specific performance should not have been granted because enforcement of the contract will require continuous and protracted judicial supervision. The courts of this state have generally followed the "archaic" rule prohibiting specific enforcement "where the contracts stipulate a succession of continuous acts which require protracted supervision and direction by the court with the exercise of special knowledge, skill and judgment by the parties performing the acts." (*Ellison* v. *Ventura Port District* (1978) 80 Cal.App.3d 574, 580 [145 Cal.Rptr. 665]; see also *Pacific etc. Ry Co.* v. *Campbell-Johnston* (1908) 153 Cal. 106, 113 [94 P. 623]; *Thayer Plymouth Center* v. *Chrysler Motors Corp.* (1967) 255 Cal.App.2d 300, 303 [63 Cal.Rptr. 148].) Although the rule has been

soundly criticized (see 7 Witkin, Summary of Cal. Law (8th ed. 1974) § 44, p. 5268; 5A Corbin on Contracts (1964) §§ 1171, 1172), its application generally is limited to building construction contracts and distribution or sales agency agreements. (See *Ellison* v. *Ventura Port District, supra,* 80 Cal.App.3d at p. 580.) Our case, of course, falls in neither category. It merely involves the offering of an opportunity to participate in a business venture and the concomitant payment of capital and expenses for that participation. We are not here concerned with the day-to-day management of any particular Hard Rock Cafe or related enterprises that would require the close and ongoing cooperation of the parties or the court. As previously noted, defendant retains the discretion under the terms of the judgment to structure each venture as he pleases so long as he maintains the 20/80 ratio and does nothing to interfere with or burden plaintiff's right to participate in the deal. Under these circumstances, we cannot conclude that the decree of specific performance is unduly burdensome or requires inordinate supervision by the trial court.

Having undertaken an independent examination of the 1982 agreement and the record, we are convinced that the trial court's interpretation of Paragraph 9 is correct. We therefore sustain that interpretation and reject defendant's argument to the contrary. (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d 861, 866; *Re* v. *Wells Fargo Bank* (1969) 269 Cal.App.2d 783, 786 [75 Cal.Rptr. 367].)

We next turn our attention to that portion of the judgment which awarded plaintiff $200,000 in punitive damages for defendant's purported bad faith denial of the existence of the contract. Defendant asserts that the evidence adduced at trial on this issue simply fails to support the court's finding. We have concluded, however, that the award must fall for a more fundamental reason.

Plaintiff's first amended complaint alleged that defendant had breached the implied covenant of good faith and fair dealing by, among other things, denying "in bad faith and without probable cause that the March [1982] Agreement existed with respect to any right of plaintiff to participate in the Chicago Hard Rock Cafe." This particular aspect of the cause of action apparently was based on certain language found in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 769, recognizing for the first time that tort liability may arise from the bad faith denial of a contract. The import of that holding can best be understood by examining the context in which the litigation arose.

In 1971, Seaman's Direct Buying Service, a small marine-fueling station in Eureka, sought to expand its operation by developing a marine-fuel

dealership in conjunction with the city's waterfront development. Before the city would approve a long-term lease in the marina, Seaman's was required to secure a binding commitment from an oil supplier. By 1972, Seaman's reached a tentative agreement with Standard Oil, and both parties signed a letter of intent setting forth the basic terms of the deal. That letter, however, was subject to government approval of the contract, continued approval of Seaman's credit status, and future agreement on specific arrangements. Seaman's subsequently offered the letter to the city and signed a long-term lease for the marina area it sought. Shortly thereafter, the OPEC oil crisis dramatically reduced the available supplies of oil. In November 1973, Standard Oil informed Seaman's that new federal regulations requiring allocation of petroleum products to those who had been customers since 1972 precluded it from executing a dealership agreement. In response, Seaman's obtained an exemption from the appropriate federal agency authorizing the delivery of the fuel. Although Standard Oil appealed and persuaded the agency to reverse the order, Seaman's eventually had the exemption reinstated contingent on a court determination that a valid contract existed between the parties. Seaman's then requested Standard Oil to stipulate to the existence of a contract, stating that a refusal would force it to discontinue operations. When Standard Oil refused, Seaman's business collapsed and it sued for, among other things, breach of contract and tortious breach of the implied covenant of good faith and fair dealing. A jury subsequently awarded Seaman's compensatory damages for breach of contract and punitive damages on the bad faith claim.

On appeal, Standard Oil argued that breach of the implied covenant did not give rise to tort liability in the ordinary commercial contract, and urged the Supreme Court to reverse the punitive damage award. In reaching its result, however, the court took a considerably different approach. After acknowledging that it had imposed tort liability for breach of the covenant in insurance contracts, the court pointedly observed that such liability was justified because of the "special relationship" between the insurer and insured, characterized by elements of public interest, adhesion and fiduciary responsibility. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 768.)

Cautioning against an extension of tort liability beyond parties with special relationships to ordinary commercial contracts, the court noted: "When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach. They may not be permitted to disclaim the covenant of good faith

but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. [Fn. omitted.] In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application." (36 Cal.3d at p. 769.)

Having come to the brink of defining the tort of bad faith outside the realm of insurance contracts, the court found it unnecessary to base its decision on Standard Oil's alleged breach of the implied covenant. Instead, the court held that a party to a contract may be subject to tort liability when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists. (36 Cal.3d at p. 769.) Referring to an Oregon case imposing tort liability on a defendant who used the bad faith threat of suit under a contract to extort payment, the court concluded: "There is little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. [Citation.] Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties." (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 769-770.)

Although some appellate courts have characterized the holding in *Seaman's* as creating a "new intentional tort" which requires no special relationship for the imposition of liability (see *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 890 [208 Cal.Rptr. 394]; see also *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co.* (1987) 189 Cal.App.3d 925 [235 Cal.Rptr. 12]), other courts and commentators have questioned the underpinnings of the decision and its analytical distinction between the "new" tort and the bad faith breach of a contract. (See Putz, *Commercial Bad Faith: Attorney Fees—Not Tort Liability—Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419; Cohen, *Reconstructing Breach of the Implied Covenant of Good Faith and Fair Dealing as a Tort* (1985) 73 Cal.L.Rev. 1291.) Writing for a unanimous panel in *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d 1155, 1170, Justice Kaufman stated: "While the court in *Seaman's* stated [that] it was not necessary to base its decision on the implied covenant of good faith and fair dealing [citations], it is difficult otherwise to understand its repeated reference to 'good faith' and 'bad faith' and a

number of commentators suggest that the decision must be understood as resting at least on one aspect of the implied covenant of good faith and fair dealing. [Citations.]"

Even more recently, the court in *Rogoff* v. *Grabowski* (1988) 200 Cal.App.3d 624, 629-630 [246 Cal.Rptr. 185], observed: "The court in *Seaman*'s did not purport to define the tort cause of action for breach of the implied covenant; however, the language defining the 'new intentional tort' has striking similarities to the language in prior cases which had defined the tort of breach of an implied covenant of good faith and fair dealing as bad faith conduct, *extraneous* to the contract, with the motive intentionally to frustrate the enjoyment of contract rights. (*Sawyer* v. *Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623]; and see *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 479 [199 Cal.Rptr. 613].) The majority in *Seaman*'s cites *Sawyer* with approval (see 36 Cal.3d at p. 770), thus intimating that the cause of action it found to exist in *Seaman*'s, based in part on principles in *Sawyer*, may be a subset of, or one species of, the tort of breach of the implied covenant. [Fn. Omitted.] [Citation.]" (Italics in original.)

We find the foregoing observations illuminating because they serve to emphasize that denial of the existence of a contract in bad faith and without probable cause falls squarely within the realm of the covenant of good faith and fair dealing. As such, we are convinced that the court in *Seaman*'s did not intend to jettison the special relationship and expectation factors so long associated with claims for breach of the implied covenant when describing the tort of bad faith denial of a contract. Although the Supreme Court purported to base its decision on an independent tort rather than on a construction of the implied covenant of good faith and fair dealing, we think it clear that the court was in fact defining "bad faith" when it concluded that a party "may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." (*Seaman*'s, *supra*, 36 Cal.3d 752, 769.) This is further apparent in the court's adoption of the principle articulated in *Sawyer* v. *Bank of America*, *supra*, 83 Cal.App.3d at page 139, that "it is not a tort for a contractual obligor to dispute his liability under a contract" if the dispute is honest and undertaken in good faith. (*Seaman*'s, *supra*, 36 Cal.3d at p. 770.)

As previously noted, some appellate courts have interpreted *Seaman*'s as holding that "stonewalling," that is, unreasonable denial of liability without a substantial defense, constitutes a tortious breach of the covenant of good faith, at least in those instances where a special relationship exists between the parties. Most notably, in *Commercial Cotton Co.* v. *United California*

*Bank* (1985) 163 Cal.App.3d 511 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017], the court found that the defendant bank had breached the implied covenant by claiming nonexistent legal defenses "in an unjustifiable, stonewalling effort to prevent an innocent depositor from recovering money entrusted to and lost through the bank's own negligence." (*Id.* at p. 516.) At the same time, the court held that the bank-depositor relationship was a "special relationship" within the meaning of *Seaman's* that justified the imposition of tort liability. Similarly, in *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d 1155, involving a breach of an employment contract, the court stated: "If . . . the existence of good cause for discharge is asserted by the employer without probable cause and in bad faith, that is, without a good faith belief that good cause for discharge in fact exists, the employer has tortiously attempted to deprive the employee of the benefits of the agreement, and an action for breach of the implied covenant of good faith and fair dealing will lie." (*Id.* at p. 1171.) The court acknowledged that the employment relationship possessed characteristics similar to those existing between insurer and insured which gave rise to a remedy in tort. (See also *Seaman's, supra,* 36 Cal.3d at p. 769, fn. 6; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 179, fn. 12 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].)

█ By viewing the bad faith denial of a contract as a breach of the implied covenant of good faith and fair dealing we necessarily limit its application to those situations involving a "special relationship" between the contracting parties. Even a cursory review of the cases since *Seaman's* makes it obvious that those courts which have considered the issue consistently analyze breaches of the implied covenant in terms of analogy to the fiduciary and unequal bargaining positions said to exist between insurer and insured. (See e.g., *Caplan* v. *St. Joseph's Hospital* (1987) 188 Cal.App.3d 1193 [233 Cal.Rptr. 901]; *Commerical Cotton Co.* v. *United California Bank, supra,* 163 Cal.App.3d 511; *Quigley* v. *Pet, Inc., supra,* 162 Cal.App.3d 877.) In *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123], a case involving an employer's refusal to pay a laid-off employee agreed-upon termination benefits, the court found that the agreement between the parties gave rise to an action in tort because of its similarities to an insurance contract. In so concluding, the court reasoned that five "similar characteristics must be present in a contract" in order for one of the parties to state a cause of action for tortious breach of the implied covenant of good faith and fair dealing: "(1) the contract must be such that the parties are in inherently unequal bargaining positions; (2) the motivation for entering the contract must be a nonprofit motivation, i.e., to secure peace of mind, security, future protection; (3) ordinary contract damages are not adequate, because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior

party 'whole'; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability." (*Id.* at p. 1118.)

We agree with the court's holding in *Wallis* and adopt its reasoning here. Unless a party is able to demonstrate that its contract meets, at least in substantial part, the foregoing criteria an action in tort will not lie for bad faith denial of a contract. This restriction appropriately limits the availability of a remedy in tort for breach of the implied covenant to those parties who, because of their unequal bargaining power, are not "free to shape the contours of their agreement" or set "the standards by which application of the covenant is to be measured." (See *Seaman's, supra,* 36 Cal.3d 752, 769.) At the same time it also serves to reduce the potential for turning every breach of contract dispute into a punitive damage action. Although we are of the view—as are many others—that the whole concept of tort liability in bad faith commercial litigation needs to be reexamined, until that time comes the interpretation adopted here complies with the spirit of the court's decision in *Seaman's*.

In our case, plaintiff himself pleaded defendant's bad faith denial of their contract as part of his cause of action for breach of the implied covenant of good faith and fair dealing. Although the evidence adduced at trial tends to support the finding that defendant acted in bad faith in contesting the validity of the 1982 agreement, and even though there exists a type of fiduciary relationship between the parties, because of the way in which the investment was structured, we are of the opinion that the relationship was not that "special" to justify awarding plaintiff punitive damages on his claim for tortious breach of contract. We are not convinced the concept of tortious breach should be extended outside the narrowly defined realm of insurance and employment contracts to the commercial field generally, and thus agree with the observation in *Seaman's* that courts should tread lightly when fashioning tort remedies for breaches of the implied covenant of good faith and fair dealing.

The parties were not in unequal bargaining positions at the time they negotiated Paragraph 9 or any other term of the agreement. Indeed, plaintiff was a sophisticated investor who was fully capable of protecting his rights under the contract. Both he and defendant were represented by counsel during most phases of the negotiating process, and each had the opportunity to consult with their advisers at length before executing the agreement. While there may have been some pressure on plaintiff to finalize the deal before the limited partner offering expired, he was far from coerced into accepting any of defendant's proposals. The pace at which the bargaining

progressed is not indicative of a hurried transaction that deprived either party of the opportunity to consider the various alternatives available to them.

It almost goes without saying that neither party entered into the contract "to secure peace of mind," as that term is used in *Wallis* v. *Superior Court, supra,* 160 Cal.App.3d 1109, 1118, but rather for the sole purpose of making a profit on their investment. Perhaps more importantly, there is nothing in the record to indicate that the remedy afforded by plaintiff's cause of action for breach of fiduciary duty would be inadequate to compensate him in tort for any harm suffered or as a deterrent to defendant's wrongful conduct. "Such inadequacy is, of course, a cornerstone of the judicial policy supporting a tort remedy for violation of the covenant of good faith and fair dealing found in every contract." (*Gomez* v. *Volkswagen of America, Inc.* (1985) 169 Cal.App.3d 921, 928-929 [215 Cal.Rptr. 507]; see also *Rogoff* v. *Grabowski, supra,* 200 Cal.App.3d 624, 633.)

Based upon the foregoing, we can only conclude that the trial court's award of punitive damages for defendant's tortious breach of contract cannot stand.

Defendant lastly contends that the evidence is insufficient to support the finding that he committed fraud by concealing from plaintiff, prior to the signing of the 1982 agreement, the fact that a dispute existed between himself and his London partner, Isaac Tigrett, over the rights to exploit the Hard Rock name and concept in the United States.[9]

Although at trial defendant vigorously challenged plaintiff's claim that he had never been told of any limitations on the use of the trademark (see fn. 3, *ante*), he now concedes the sufficiency of the evidence on this issue. He does argue, however, that plaintiff failed to prove that he detrimentally relied on any such omissions or misrepresentations in deciding to enter into the contract. We agree.

"In its broad, general sense the concept of fraud embraces anything which is intended to deceive, including all statements, acts, concealments

---

[9] The trial court's statement of decision provides in pertinent part: "The court finds that Morton did fail to disclose to Okun that his exclusive right to use and exploit the Hard Rock name and mark [was] not secure, and in fact [was] in dispute. Morton's failure to make disclosures in this regard was at a time when his relationship with Okun imposed upon him an affirmative duty to make such disclosures. His failure to do so constituted fraud. This conduct was aggravated by the manner in which the *Tigrett* litigation was settled by Morton without Okun's consent and adverse to his rights. [¶] Okun is entitled to general damages for said conduct, measured by the amount of money he paid toward the Tigrett litigation. The sum is approximately $25,000 but the exact amounts are in evidence. Interest at the legal rate shall be added to said sum(s). [¶] Punitive damages in the sum of $50,000 are assessed in favor of Okun and against Morton for said conduct."

and omissions involving a breach of legal or equitable duty, trust or confidence which results in injury to one who justifiably relies thereon." (*Pearson* v. *Norton* (1964) 230 Cal.App.2d 1, 7 [40 Cal.Rptr. 634].)

The elements of actionable fraud have been set forth on numerous occasions by the courts of this state and may be summarized as follows: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages. (*Shurpin* v. *Elmhirst* (1983) 148 Cal.App.3d 94, 101 [195 Cal.Rptr. 737]; *Harazim* v. *Lynam* (1968) 267 Cal.App.2d 127, 130 [72 Cal.Rptr. 670]; *Zinn* v. *Ex-Cell-O Corp.* (1957) 148 Cal.App.2d 56, 58 [306 P.2d 1017]; see also 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778.) *All* of these elements must be present if actionable fraud is to be found; one element absent is fatal to recovery. (*Ach* v. *Finkelstein* (1968) 264 Cal.App.2d 667, 674-675 [70 Cal.Rptr. 472].)

A misrepresentation of fact is material if it induced the plaintiff to alter his position to his detriment. (*Bezaire* v. *Fidelity & Deposit Co.* (1970) 12 Cal.App.3d 888, 893 [91 Cal.Rptr. 142].) Stated in terms of reliance, materiality means that without the misrepresentation, the plaintiff would not have acted as he did. (*Adkins* v. *Wyckoff* (1957) 152 Cal.App.2d 684, 689 [313 P.2d 592].) "It must be shown that the plaintiff actually relied upon the misrepresentation; i.e., that the representation was 'an immediate cause of his conduct which alters his legal relations,' and that without such representation, 'he would not, in all reasonable probability, have entered into the contract or other transaction.' [Citations.]" (5 Witkin, Summary of Cal. Law, Torts, *supra*, § 711, p. 810.)

Applying these principles to the case at bench, the record makes it clear that plaintiff did not rely on defendant's representations concerning Tigrett's trademark claims in deciding to execute the agreement. When asked at trial whether he would have entered into the contract had he known that defendant's right to exploit the Hard Rock name in the United States was limited by a preexisting agreement with Tigrett, plaintiff replied, "I don't know. *I probably would have.*" Although he now argues that he would have answered differently had the question been more specific, plaintiff had more than an adequate opportunity to explain his reply or otherwise rehabilitate himself at trial. He did not do so. In any event, his answer was consistent with the fact that the geographic limitations resulting from defendant's 1981 telex agreement with Tigrett did not materially alter what he expected to receive under the terms of the contract. While it may be true that plaintiff paid in excess of $35,000 in litigation costs because of defendant's trademark suit against Tigrett, he assumed that expense voluntarily after being advised by his legal counsel that he was not required to do so

under the terms of the parties' 1982 agreement. We do not doubt that defendant was overreaching at the time he demanded plaintiff share the costs of the suit or risk being disenfranchised from his right to participate in future ventures. We cannot conclude, however, that plaintiff suffered pecuniary damage because of his contribution to the litigation. The causal connection between defendant's fraudulent conduct and the payment of court costs and attorney's fees is simply too tenuous to support an award of compensatory damages under the circumstances presented here. (See *South Tahoe Gas Co.* v. *Hofmann Land Improvement Co.* (1972) 25 Cal.App.3d 750, 765 [102 Cal.Rptr 286]; *Hill* v. *Wrather* (1958) 158 Cal.App.2d 818, 825 [323 P.2d 567].) The award of punitive damages in the amount of $50,000 also must fall with plaintiff's failure to prove detrimental reliance. (See *Orient Handel* v. *United States Fid. & Guar. Co.* (1987) 192 Cal.App.3d 684, 697 [237 Cal.Rptr. 667].)

That portion of the judgment decreeing specific performance and declaring the parties' rights and obligations under the March 1982 agreement is affirmed. The award of compensatory and punitive damages for defendant's bad faith denial of the contract and for fraud is reversed. The remainder of the judgment is affirmed. Defendant to bear costs on appeal.

Roth, P. J., and Gates, J., concurred.

A petition for a rehearing was denied September 7, 1988, and appellants' petition for review by the Supreme Court was denied November 9, 1988.