Jacklyn TULL, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. S-90-0994 MLS.

United States District Court,
E.D. California.

Jan. 25, 1994.

**1468**

R. Todd Luoma, Weintraub, Genshlea & Sproul, Sacramento, CA, for plaintiffs.

G. Patrick Jennings, Trial Atty., Tax Div. U.S. Dept. of Justice, Washington DC, for defendant.

### MEMORANDUM OF DECISION AND ORDER

MILTON L. SCHWARTZ, Senior District Judge.

### I. Factual and Procedural Background.

Plaintiffs filed this action on August 1, 1990, seeking refund of taxes allegedly illegally and erroneously assessed against plaintiff Jacklyn Tull and collected from both plaintiffs by defendant, acting by and through the Internal Revenue Service ("IRS"). At all relevant times, plaintiff Jacklyn Tull was Secretary and Treasurer of Hatfield Trucking Company ("Hatfield") and plaintiff James Tull was her husband. The amounts assessed against plaintiff Jacklyn Tull ($203,904.32) constituted a "100% penalty" assessment against her pursuant to 26 U.S.C. § 6672(a).[1] The penalty arose out of plaintiff Jacklyn Tull's alleged willful failure to "collect, truthfully account for and pay over" Hatfield's federal payroll tax obligations for the first three quarters of 1989.[2]

Plaintiffs' complaint alleged that the penalty was wrongful because Hatfield had fully paid its trust fund tax liability via five separate federal tax deposits, certain cashier's checks and one auction proceeds check, thus completely extinguishing the basis upon which a 100% penalty could have been assessed against plaintiff Jacklyn Tull. Alternatively, plaintiffs contended that plaintiff Jacklyn Tull was not a responsible person required to collect, or truthfully account for and pay over Hatfield's payroll taxes and/or that her conduct was not willful, within the meaning of 26 U.S.C. § 6672. Finally, plaintiffs alleged that defendant had wrongfully levied upon the wages of plaintiff James Tull for payment against the 100% penalty, on the grounds that his wages were separate property that could not be used to satisfy his wife's alleged tax liabilities, or alternatively that the amount of the levy exceeded the community property interest of plaintiff Jacklyn Tull in plaintiff James Tull's wages. Plaintiffs prayed for judgment in the total amount of $10,669.03, plus interest and costs.

Both parties filed cross-motions for summary judgment on May 17, 1991, which were heard on June 14, 1991. Plaintiffs' motion for summary judgment was granted in part (as to the question whether defendant should have allocated the cashier's checks, in the

---

**1.** Section 6672(a) provides:
[a]ny person required to collect, truthfully account for, and pay over any tax imposed by [the Internal Revenue Code] who willfully fails to collect such tax, or truthfully account for and pay over such tax ... shall ... be [personally] liable [for] a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

**2.** "Federal payroll tax" obligations or liabilities include:
(1) federal income and Federal Insurance Contributions Act ("FICA") taxes withheld by Hatfield from its employees' wages; and (2) FICA taxes imposed on Hatfield as its employer contributions. Pursuant to 26 U.S.C. § 6672, defen-

dant asserted the penalty assessments only as to the first category of federal payroll tax obligations. Because this category of taxes is required to be held by the employer in trust for the United States, such taxes are commonly known as "trust fund taxes." *See Slodov v. United States*, 436 U.S. 238, 242–43, 98 S.Ct. 1778, 1782–83, 56 L.Ed.2d 251 (1978). The second category of federal payroll tax obligations (otherwise known as "non-trust fund taxes") are not subject to a 100% penalty under 26 U.S.C. § 6672, and are not at issue in this case. *Davis v. United States*, 961 F.2d 867, 869 (9th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 969, 122 L.Ed.2d 124 (1993).

amount of $69,591.31, to Hatfield's trust fund tax liabilities), and denied in part (as to the questions whether the five separate federal tax deposits and the auction proceeds check should have been allocated to Hatfield's trust fund tax liabilities). Defendant's motion for summary judgment (directed solely to the issue whether the auction proceeds check should have been allocated to trust fund tax liabilities) was denied in full. The court found that there were disputed facts concerning the federal tax deposits and the auction proceeds check payments.

On February 27, 1992, defendant filed a counterclaim against plaintiff Jacklyn Tull which sought to reduce to judgment its penalty assessment for the balance of the trust fund taxes allegedly owing (approximately $164,000, inclusive of statutory interest to June 8, 1992). Defendant also sought an award of attorney's fees and costs.

Subsequently, defendant conceded that Hatfield had paid certain percentages of four of the five disputed federal tax deposits to its trust fund tax liabilities (totalling $26,359.37). Accordingly, defendant reduced the 100% penalty and the amount of its counterclaim to $115,464.45 to reflect the court's granting of summary judgment with respect to the cashier's checks and to reflect defendant's concession with respect to the four federal tax deposits.[3]

On March 27, 1992, the court filed its Final Pretrial Order, which outlined the following remaining issues for trial:

(1) Were the payments received by defendant from Hatfield Trucking for the first three quarters of calendar [year] 1989 sufficient to cover all trust fund taxes owing for that period, without resort to plaintiffs' personal assets,[4] and if not, what amount should have been assessed against plaintiff Jacklyn [Tull]?

(2) Was plaintiff Jacklyn [Tull] a "responsible person," within the meaning of the law, to collect and pay over to defendant the withheld income and FICA payroll taxes, and if so, were her actions "willful" so as to subject her to personal liability in the form of penalty assessments?

(3) If plaintiff Jacklyn [Tull] is determined to be a "responsible person" who "willfully" failed to collect and pay over the withheld income and FICA payroll taxes, at what point during the first three quarters of 1989 did plaintiff Jacklyn [Tull] become responsible and [did her] actions constitute willful conduct?

(4) If plaintiff Jacklyn [Tull] is determined to be a "responsible person" who "willfully" failed to collect and pay over the withheld income and FICA payroll taxes, may defendant collect the penalty assessment from the community wages of plaintiff James C. Tull?

Final Pretrial Order at 2:14–3:7 and Plaintiffs' Objections to Final Pretrial Order at 2:1–14.

A jury trial was held on January 4 through 14, 1993. During the jury instruction conference on January 12, 1993, the court determined, over plaintiffs' objection, that the question whether defendant should have allocated the auction proceeds check to Hatfield's trust fund tax liabilities was not appropriate for jury resolution.[5] The court reasoned that, although the auction proceeds check issue might be considered a mixed question of law and fact, it became purely a question of law for the court to determine because there were no disputed underlying facts pertinent to resolution of the issue. In light of the court's ruling, it was agreed that the auction proceeds check issue would be resolved by way of post-trial briefs filed by both parties. It was also agreed that the community property issue and any other re-

---

**3.** The court notes that, pursuant to the Internal Revenue Manual, credit to trust fund tax liability does not necessarily result in a dollar-for-dollar reduction in the 100% penalty.

**4.** This dispute involves the questions whether defendant improperly allocated the one remaining disputed federal tax deposit, in the amount of $9,566.36, and the auction proceeds check, in the amount of $111,152.92, to Hatfield's nontrust fund tax liabilities.

**5.** Although a deceptively simple-sounding issue, this issue is in reality a complicated analysis involving several analytical steps, as discussed *infra*.

maining unresolved legal issues would be decided in this manner as well. Accordingly, the jury instructions were limited to the federal tax deposit issue and the 100% penalty issues.

By special verdict filed January 14, 1993, the jury found that Hatfield had made a federal tax deposit on April 27, 1989, in the amount of $9,566.36.[6] The jury also found that plaintiff Jacklyn Tull: (1) was a responsible person for all three quarters of 1989; (2) did not willfully fail to collect, or truthfully account for and pay over Hatfield's payroll taxes for the first quarter of 1989; but (3) did willfully fail to collect, truthfully account for and pay over Hatfield's payroll taxes for the second and third quarters of 1989. In light of the unresolved legal questions in the case, however, no judgment was entered on the jury's verdict.

After a significant delay during which the parties unsuccessfully attempted to settle the case, plaintiffs and defendant each timely filed opening and opposing post-trial briefs, pursuant to the court's instructions. Following an in-chambers meeting on August 13, 1993 and a telephonic conference call between the court and counsel for plaintiffs and defendant on August 19, 1993, both parties agreed to submit the matter for decision after additional supplemental briefing, without further oral argument. Both parties also agreed, by stipulations filed August 13, 1993 and January 11, 1994, as to the monetary effect of a ruling in favor of either party on the auction proceeds check issue and other post-trial issues, for purposes of entry of final judgment in this case.

## II. Relevant Undisputed Facts.

The following is a narrative discussion of the undisputed facts set forth in Exhibit A to the Final Pretrial Order and the undisputed facts adduced at trial.

## A. General.

Hatfield was incorporated in Sacramento, California in 1967 and operated continuously from the date of incorporation through the period at issue in this case (i.e. the first three quarters of 1989). In 1989, Hatfield began experiencing certain financial difficulties and failed to pay a portion of its federal payroll tax liability during the first three quarters of 1989. The fourth quarter federal payroll tax liability was fully paid. During the first quarter of 1989, Hatfield incurred a payroll tax liability of $116,056.20, the trust fund portion of which was approximately $83,934. During the second quarter of 1989, Hatfield incurred a payroll tax liability of $99,493.63, the trust fund portion of which was approximately $71,976. During the third quarter of 1989, Hatfield incurred a payroll tax liability of $81,006.38, the trust fund portion of which was approximately $59,028.

On November 22, 1989, Hatfield entered into an auction agreement with Western 11 Auctions ("Western") to sell some of Hatfield's assets. Plaintiff Jacklyn Tull advised the IRS of the auction on January 2, 1990. On January 8, 1990, the IRS served a notice of levy on Western with respect to Hatfield's payroll tax liabilities for the first two quarters of 1989. Pursuant to the auction agreement, the auction took place on January 18, 1990 on Hatfield's premises. On or about that same day, the IRS assessed a 100% penalty against plaintiff Jacklyn Tull in the amount of $203,904.32 for the allegedly unpaid trust fund portions of Hatfield's payroll tax liabilities for the first three quarters of 1989.[7]

On or about February 12, 1990, a Western representative delivered to Hatfield a check in the amount of $111,152.92, made payable jointly to Hatfield and the IRS. While the representative was present, plaintiff Jacklyn Tull designated on the face of the check that the monies should be applied against the trust fund portion of Hatfield's second and

---

**6.** Plaintiffs and defendant subsequently stipulated that $6,845.27 of this deposit would be credited to Hatfield's trust fund liabilities. *See* Stip. Re Acct'g Effects of Verdict and Post-trial Issues, Att. n. 5.

**7.** As noted *supra,* the penalty was subsequently reassessed at $115,464.45 to reflect the court's granting of summary judgment for plaintiff with respect to the cashier's checks and the IRS' concession with respect to four of the five federal income tax deposits.

third quarter federal payroll tax liabilities. Plaintiff Jacklyn Tull then told the Western representative that she would deliver the check to the IRS. However, the representative offered to deliver the check for her, since he was going in that direction anyway. Plaintiff agreed to let him do so. The IRS refused to accept the check from Western because it deemed the designation to trust fund invalid, in light of its conclusion that the payment was "involuntary" (as allegedly having been made in response to the IRS' January 8, 1990 levy—see discussion *infra*). Following the IRS' instructions, Western subsequently gave the IRS an undesignated check made payable solely to the IRS in the amount of $94,772.90, and sent the balance of the proceeds to the California Employment Development Department, which had allegedly asserted a prior lien in the amount of $16,380.02. The IRS then applied the auction payment to Hatfield's non-trust fund tax liabilities.

### B. Facts Relevant to Auction Proceeds Check Issue.

The auction agreement was entered into between Hatfield and Western on November 22, 1989. The written agreement provided for an auction date of January 18, 1990 and stated that Hatfield had employed Western, and "in consideration of [Western's] efforts to sell the property hereafter described" gave Western "the sole and exclusive right to offer for sale and to sell the property described in Schedule A annexed to and incorporated in this agreement, at public auction, according to the terms and conditions set out herein." Pls.' Ex. 41. However, no "Schedule A" was ever appended to the agreement.

Under the terms of the auction agreement, Western was to receive a 10% commission on all property sold at the auction. The agreement also provided, *inter alia*, that Western was required to:

(1) Prepare and distribute a catalogue of Hatfield's property prior to the auction sale;

(2) Advertise the auction sale according to the custom and usage of the business;

(3) Furnish to Hatfield a list of Hatfield's property within fifteen days of the auction sale.

(4) Bear the risk of loss of or damage to the property not caused by Hatfield's negligence, but only after delivery by Hatfield of the property to be sold to the place of sale (Hatfield's business premises) at least three days prior to the time of sale; and

(5) Cause the buyer to sign, immediately after the sale was consummated, a "memorandum of sale" and collect the purchase price in cash, certified check, or other form of payment agreeable to Western, Hatfield and the buyer.

Finally, the agreement provided that Hatfield could not withdraw its property prior to the auction sale without Western's prior written consent, subject to the same commission as that on unsold property.

At least one month prior to the auction (before the levy was served), Hatfield provided Western with a basic equipment list. Shortly thereafter, Hatfield and Western, through negotiations, marked up this list to identify specifically what items on the list were to be sold at the auction. Both parties to the auction agreement understood that Hatfield intended to offer a majority (i.e. 50% or more) of its trucking equipment (the most significant items of value possessed by Hatfield) for sale at the auction. However, notwithstanding the auction agreement's contrary provision, Mr. Hatfield and Western orally agreed that John Hatfield, plaintiff Jacklyn Tull's brother and the president of Hatfield, could remove equipment from the auction yard (Hatfield's place of business) in order to use, keep or sell some of the equipment himself. Mr. Hatfield was removing certain equipment from the auction yard up until a day or two before the auction.

About three weeks prior to the auction (again before the levy was served), Western circulated, at its own expense, an advertising brochure, which was based on the equipment list and which listed the items to be sold at the auction. The brochure also included a number of other items, such as office and shop equipment, that were not on the equipment list but that were ultimately offered for

sale at the auction. However, the brochure did not list all of the items that were eventually offered for sale, and also listed some items that were not ultimately offered for sale, including certain truck trailers. It also included some items that were not owned or possessed by Hatfield.

On January 5, 1990 (three days before the levy was served), Western hired a company, at its own expense, to clean a large number of the trucks to be sold at the auction, for which Western was subsequently billed $2,000.00.

Notwithstanding the above activities, the specific items to be sold at the auction were not identified until Western prepared the final lot list one to two days before the auction (after the levy was served).

### III.  Analysis and Discussion.

Having considered all of the evidence, arguments and written post-trial submissions of the parties, the court now renders its decision on the remaining legal issues in this case.

### A.  Mandamus Against the United States.

■ As a threshold matter, defendant argues that, because plaintiffs' action seeks to compel the IRS to reapply designated payments from Hatfield's non-trust fund tax liabilities to its trust fund tax liabilities, it is therefore in the nature of an action seeking mandamus against the IRS. Defendant contends that the taxpayer's burden in a mandamus action is quite heavy and that plaintiffs have failed to carry this burden. Specifically, defendant asserts that plaintiffs have not proven that: (1) they have shown a clear right to the relief sought; (2) the IRS has a clear duty to do the particular act sought; and (3) no other adequate remedy is available. Def.'s Post–Trial Brief at 6:21–25, (citing *First Federal Sav. & Loan Ass'n of Durham v. Secty. of the Treasury*, 860 F.2d 135 (4th Cir.1988)).

As its sole support for the argument that plaintiffs' action is in the nature of mandamus, defendant cites *Davis v. United States*, 961 F.2d 867 (9th Cir.1992). In *Davis*, the Ninth Circuit held that an appeal from denial of a motion seeking reduction in the amount of a 100% penalty assessment pursuant to 26 U.S.C. § 6672 "should be treated as an appeal from the denial of mandamus, which is reviewable for an abuse of discretion." *Id.* at 878.

*Davis*, however, is distinguishable from the instant case because *Davis* involved only undesignated payments, which the IRS has discretion to allocate as it sees fit. *See id.* at 878, 880 (citing *Muntwyler v. United States*, 703 F.2d 1030, 1032 (7th Cir.1983)). Thus, a suit compelling the IRS to reallocate undesignated payments is essentially requiring the IRS to do something which it normally should not be required to do. In such a case, it makes sense to require the taxpayer to meet a heavier burden than under other circumstances. Indeed, the *Davis* court so recognized, stating that application of the abuse of discretion/mandamus standard of review to suits challenging the IRS' allocation of undesignated payments "recognizes the IRS's general authority to allocate [such payments] as it sees fit." 961 F.2d at 878.

On the other hand, when the taxpayer is alleging that he or she properly designated payments to trust fund tax liabilities, as plaintiff Jacklyn Tull contends here, the circumstances are quite different. If the taxpayer is correct, then the IRS has no right to apply the payments to non-trust fund tax liabilities. *See In re Technical Knockout Graphics, Inc.*, 833 F.2d 797, 799 (9th Cir. 1987). In fact, the *Davis* court explicitly acknowledged that in cases involving designated payments, the IRS may be required to apply payments consistent with the designation, if valid. 961 F.2d at 878–80. Therefore, contrary to defendant's contention, actions seeking to compel the IRS to reapply designated payments are not in the nature of mandamus.

### B.  Auction Proceeds Check Issue.

■ The court now turns to the key remaining issue to be resolved in this case; that is, whether defendant properly credited the first auction proceeds check, in the amount of $111,152.92, to Hatfield's non-trust fund tax liabilities, notwithstanding its desig-

nation to trust fund liabilities on the face of the check. Resolution of this issue turns on whether the auction proceeds check was a "voluntary" or an "involuntary" payment. If the payment is voluntary, the taxpayer may designate it to its trust fund tax liabilities, and the IRS must honor that designation. *Slodov v. United States,* 436 U.S. 238, 252 n. 15, 98 S.Ct. 1778, 1787 n. 15, 56 L.Ed.2d 251 (1978); *Technical Knockout Graphics,* 833 F.2d at 799. If, on the other hand, the payment is involuntary, any designation by the taxpayer to trust fund liabilities is ineffective, and the IRS is entitled to apply the payment to either non-trust fund or trust fund tax liabilities. *Liddon v. United States,* 448 F.2d 509, 513 (5th Cir.1971), *cert. denied,* 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972); Internal Revenue Manual 56(18)3.1 and 56(18)3.2. An involuntary payment is one that is received "as a result of distraint or levy or from a legal proceeding in which the [g]overnment is seeking to collect its delinquent taxes or file a claim therefor." *Technical Knockout Graphics,* 833 F.2d at 802. The IRS typically chooses to apply an involuntary payment to non-trust fund tax liabilities first. Internal Revenue Manual 56(18)3.1 and 56(18)3.2. If the payment is insufficient to satisfy the taxpayer's non-trust fund and trust fund tax liabilities, the IRS may then seek to recover the remaining trust fund tax owed by assessing a 100% penalty against the responsible person's personal assets. 26 U.S.C. § 6672.

Plaintiffs argue that the auction proceeds check was a voluntary payment and that the IRS was accordingly required to honor Hatfield's designation to trust fund liabilities on the face of the check. Plaintiffs assert that the payment was voluntary because: (1) the IRS' levy was invalid; and (2) even assuming the levy was valid, Hatfield's exercise of dominion and control over the auction proceeds check converted what might otherwise have been involuntary payment into a voluntary one. These arguments are addressed below.

### 1. Validity of the levy.

26 U.S.C. § 6331 sets forth the requirements for a valid IRS levy. That section provides:

(a) [i]f any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand it shall be lawful for the Secretary to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon *all property and rights to property* belonging to such person or on which there is a lien provided in this chapter for the payment of such tax.

(b) [t]he term "levy" as used in this title includes the power of distraint and seizure by any means. Except as otherwise provided in subsection (e), *a levy shall extend only to property possessed and obligations existing at the time thereof.*

(Emphasis added). Treasury Regulation § 301.6331–1(a)(1) elaborates on the requirements of section 6331(b), providing that:

[e]xcept as provided in § 301.6332–2(c) with regard to a levy on salary or wages, a levy extends only to property possessed and obligations which exist at the time of the levy. Obligations exist when the *liability of the obligor is fixed and determinable* although the right to receive payment thereof may be deferred until a later date.

(Emphasis added).

The determination whether an IRS levy is valid under the above sections requires a two-step analysis. First, "state law controls in determining the nature of the legal interest which the taxpayer had in the property ... sought to be reached by [the federal levy] statute." *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960). Second, once these state-created rights have been determined, federal law governs whether they are "rights to property," or obligations to which an IRS tax levy may attach, within the meaning of the federal levy statute. *See Rodriguez v. Escambron Devel. Corp.,* 740 F.2d 92, 97 (1st Cir.1984), (citing *United States v. Bess,* 357 U.S. 51, 56–57, 78 S.Ct. 1054, 1057–58, 2 L.Ed.2d 1135 (1958)); *JEWIRS, Ltd. v. United States,* 607 F.Supp. 566, 568 (M.D.Pa. 1985); *see also In re Halprin,* 280 F.2d 407, 409 (3d Cir.1960) ("application of [the federal tax levy] statute involves a two-step inquiry in which both state and federal law must be consulted. State law creates legal interests

and defines their incidents, but the ultimate question whether an interest thus created and defined falls within a category stated by [the] federal [tax levy] statute requires an interpretation of that statute, which is a federal question"), (citing *Morgan v. Commissioner of Internal Revenue*, 309 U.S. 78, 309 U.S. 626, 60 S.Ct. 424, 84 L.Ed. 585 (1940)).

Plaintiffs attack the validity of the levy under both state and federal law, arguing that it was invalid because, at the time it was served (January 8, 1990): (1) the auction agreement upon which the IRS' levy was made was unenforceable under California law; and (2) Western's alleged contractual obligation to Hatfield under the auction agreement was not "fixed and determinable" within the meaning of 26 U.S.C. § 6331 and Treasury Regulation § 301.6331–1(a)(1). These arguments are analyzed separately below.

### a. Was the auction agreement enforceable under California law?

■ Plaintiffs first argue that the levy was invalid because Hatfield possessed no enforceable contract rights under California law, and therefore there was no state law property interest to which the levy could attach.[8]

■ Under California law, it is axiomatic that a contract is unenforceable for lack of certainty unless its terms are sufficiently definite and certain to enable a court "to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App.4th 613, 623, 2 Cal. Rptr.2d 288 (1991); *see also* Cal.Civ.Code §§ 1596, 1598.[9] Similarly, a contract is unenforceable for lack of certainty if an essential term is made contingent upon future agreement of the parties. *Okun v. Morton*, 203 Cal.App.3d 805, 817, 250 Cal.Rptr. 220 (1988),

*review denied,* Nov. 9, 1988; *Mabee v. Nurseryland Garden Centers, Inc.*, 84 Cal.App.3d 968, 972, 149 Cal.Rptr. 105 (1978). Finally, a contract is unenforceable if it is so uncertain that the fact of damages cannot be proved or the amount of damages cannot be proved with reasonable certainty. *DuBarry Int'l, Inc. v. Southwest Forest Indus., Inc.*, 231 Cal.App.3d 552, 562, 282 Cal.Rptr. 181 (1991). The question whether a contract is sufficiently certain to be enforced is one of law. *Ersa Grae Corp.*, 1 Cal.App.4th at 623, 2 Cal. Rptr.2d 288.

Plaintiffs argue that the auction agreement was too uncertain to be enforceable on the date the levy was served (January 8, 1990) because: (1) the basic subject matter of the agreement was so indefinite that a court would not have been able to ascertain the parties' obligations and determine whether those obligations had been breached; (2) the agreement left an essential term (i.e. what property was to be sold at the auction) for future agreement; and (3) the fact of damages could not have been determined if the agreement had been breached on that date. In support of their argument, plaintiffs point to the following undisputed facts: (1) no "Schedule A" was attached to the agreement describing what specific property was to be sold at the auction; (2) the final lot list of what property was to be offered for sale at the auction was not prepared until the day before the auction; (3) Hatfield's basic equipment list, prepared about one month prior to the auction, did not list many of the items ultimately offered for sale at the auction, such as office and computer equipment; (4) likewise, the advertising flier prepared and circulated about three weeks prior to the auction did not list many of the items ultimately offered for sale, listed other items that were *not* offered for sale, and included a number of items that were not Hatfield's; and (5) up until the day before the auction,

---

**8.** In California, a contract right is considered a property right. *See* Cal.Civ.Code § 14(3) (personal property includes "money, goods, chattels, things in action, and *evidences of debt* ") (emphasis added).

**9.** Although many California courts have stated "that more certainty is required in a suit for specific performance than in an action for dam-

ages, this rule is of doubtful practical significance, for in the large majority of California cases in which it is invoked, the contract was also too uncertain to support an action for damages." *Hennefer v. Butcher*, 182 Cal.App.3d 492, 500 n. 4, 227 Cal.Rptr. 318 (1986), *review denied,* Aug. 27, 1986.

Hatfield was constantly moving equipment in and out of the auction yard. Plaintiffs assert that these facts demonstrate that the auction agreement was unenforceable under California law and that the auction agreement could only be construed as an invalid bilateral contract at the time the levy was served.[10]

Defendant, on the other hand, contends that the subject matter of the contract was sufficiently definite and certain as of January 8, 1990 to be enforced, as evidenced by the equipment list and the advertising brochure (both produced prior to the levy), and the fact that Hatfield had substantially performed, and Western had partially performed, their respective contract obligations by the time the levy was served. Moreover, defendant asserts, plaintiffs have misread the undisputed facts in this case. In fact, defendant says, the majority of items in terms of value that were ultimately sold at the auction were included on the equipment list and listed in the advertising brochure; indeed, the advertising brochure even listed most of the office and shop equipment that plaintiffs alleged were included only on the final lot list.

The court agrees with defendant, for several reasons. First of all, the contract was not so uncertain under California law that the obligations and intentions of the parties could not have been ascertained on January 8, 1990. The modern trend in California "favors carrying out the parties' intentions through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty." *Okun,* 203 Cal.App.3d at 817, 250 Cal.Rptr. 220 (citing *California Lettuce Growers v. Union Sugar Co.,* 45 Cal.2d 474, 481, 289 P.2d 785 (1955)); *see also Wong v. DiGrazia,* 60 Cal.2d 525, 539, 35 Cal.Rptr. 241, 386 P.2d 817 (1963) ("the law does not favor, but leans against, the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if [they] can be ascertained"). Accordingly, " '[t]he defense of uncertainty has validity only when the uncertainty or incompleteness of the contract prevents the court from knowing what to enforce.' " *Okun,* 203 Cal.App.3d at 817, 250 Cal.Rptr. 220, (quoting *Hennefer v. Butcher,* 182 Cal.App.3d 492, 500, 227 Cal.Rptr. 318 (1986)). As the *Okun* court stated:

> "[i]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left."

*Id.* (quoting 1 Corbin on Contracts, § 95, p. 400 (1963)). A court may rely on extrinsic evidence to ascertain the parties' intentions, provided this evidence does not vary or contradict the terms of the contract. *Id.* 203 Cal.App.3d at 816, 250 Cal.Rptr. 220; *Hennefer,* 182 Cal.App.3d at 501, 227 Cal.Rptr. 318.

Here, undisputed extrinsic evidence establishes that, as of January 8, 1990, both parties intended to make a contract. Moreover, both parties had acted on their intentions enough to obviate any uncertainty and to enable a court to know what their obligations were and what to enforce. By the time the levy was served, Hatfield had substantially performed its obligations under the contract by giving Western a list of its equipment and by making that equipment available to Western. Both parties understood that Western's obligation was to sell the majority (i.e. 50% or more) of Hatfield's trucks and other large equipment included on the equipment list. Western had begun its bargained-for performance by circulating, at its own expense, an advertising brochure based on that equipment list, and which also listed a number of other items (such as computer and office equipment) that were included on the final lot list and ultimately offered for sale at the auction. Western also hired, again at its own expense, a cleaning company to wash Hatfield's equipment for $2,000.00. These actions of the parties constitute persuasive evidence that the agreement was not fatally uncertain.

---

**10.** Plaintiffs point out that the invalidity was subsequently "cured" on the day of the auction by Hatfield's and Western's performance, but that this cure came too late to create a valid contractual interest to which the levy could attach.

Nevertheless, plaintiffs contend that the following facts conclusively demonstrate the agreement's fatal uncertainty: (1) the final lot list was not prepared until a day before the auction and included a number of items that were not on the equipment list; (2) Hatfield was moving certain pieces of equipment in and out of the lot up until the day before the auction; and (3) the advertising brochure listed items being offered for sale by other sellers besides Hatfield. However, contrary to plaintiffs' assertion, these facts do not render the auction agreement fatally uncertain, for the same reason that a typical construction contract is not necessarily rendered unenforceable simply because the landowner submits "change orders" that may significantly vary the original contract specifications. *See Bohman v. Berg,* 54 Cal.2d 787, 797, 8 Cal.Rptr. 441, 356 P.2d 185 (1960).

*Bohman* is directly analogous to the case at bar. In *Bohman,* defendant engaged plaintiff to convert a bus into a luxury "land yacht." *Id.* at 789, 8 Cal.Rptr. 441, 356 P.2d 185. The contract between the parties provided that plaintiff would be paid $4.00–$4.65 an hour for metal and material men and ten percent above cost for all outside labor and materials, not to exceed a total of $25,000. After plaintiff began work, defendant made several changes in the original plans, as well as numerous additions. Plaintiff then informed defendant that the cost would be in excess of $25,000, and defendant paid plaintiff an additional $6,000, but refused to pay any other bills. Plaintiff then sued to recover the reasonable value of the entire remodeling job.

The trial court rendered judgment for plaintiff on grounds that "the agreement was too indefinite and uncertain to permit a meeting of the minds, and that the methods, materials and workmanship were incapable of ascertainment," but the appellate court reversed. *Id.* at 793–94, 8 Cal.Rptr. 441, 356 P.2d 185. The court held that although

"[n]umerous details had to be worked out as construction progressed . . . this fact does not render the agreement unenforceable." *Id.* at 794, 8 Cal.Rptr. 441, 356 P.2d 185. The court reasoned that, because the parties entered into an agreement that they understood and by which they intended to be bound, the court should not construe the subsequent changes and additions to be evidence of uncertainty. *Id.* In addition, the court considered the fact that the parties had fully performed the contract as evidence that the contract was not fatally certain at its inception. *Id.* at 795–96, 8 Cal.Rptr. 441, 356 P.2d 185 ("[w]hen the parties perform without objection under a contract the terms of which appear to be indefinite, they have indicated that its terms were sufficiently certain so that they, at least, could perform it").

Similarly, here, the relatively minor variations (in terms of value) between the equipment list, the advertising brochure, the final lot list, and what was eventually sold at the auction do not make the contract too indefinite and uncertain to be enforced. The undisputed evidence, including the fact that the agreement was ultimately fully performed by both parties without incident, indicates that the parties understood the terms of the agreement and intended to be bound by that agreement and that its terms were not fatally uncertain.[11]

Furthermore, even assuming that the contract was fatally uncertain at its inception, contrary to plaintiffs' assertion, this uncertainty was cured before the levy was served. Hatfield's substantial performance of its duties under the contract (to identify and deliver or otherwise make available to Western the items to be sold) and Western's partial performance of its contractual responsibilities (i.e. advertising the auction and cleaning the equipment) converted the executory bilateral contract into an enforceable unilateral contract. *See Hunter v. Sparling,* 87 Cal.App.2d 711, 725, 197 P.2d 807 (1948)

---

**11.** Plaintiffs' reliance on the testimony of Travis Owsley (the Western auctioneer), in which he states that "frankly, I was very flabbergasted at not being able to tie down the exact items that were going to be on the auction," is also misplaced. R.T., Jan. 12, 1993 at 8:10–12. This statement was made in reference to items on the equipment list that were marked "wrecked," "sold," "leased," and "junked." However, regardless of the auctioneer's feelings about the equipment list, a court could adequately determine, based on that list, what items were available to be sold.

("[a]n offer, too uncertain to create a bilateral contract if accepted, may, by performance by the offeree, create a unilateral contract"). Plaintiffs mistakenly argue that Western was required to *fully* perform its contract obligations before the uncertainty could be cured. In fact, it was not necessary for Western to have rendered *any* performance in order for a valid unilateral contract to have been created; rather, Hatfield's substantial performance alone was sufficient to obviate any uncertainty. *See id.*

Therefore, the court rejects plaintiffs' argument that the agreement was unenforceable under California law because its terms were too uncertain to enable a court to ascertain the parties' obligations and intentions.

Also without merit is plaintiffs' related but distinct argument that the agreement was unenforceable because an essential term (i.e. what property was to be sold) was made contingent upon future agreement of the parties. Even assuming that the auction agreement contained an invalid "agreement to agree," this invalidity was obviated by the parties' subsequent agreement, prior to the levy, on what property was to be sold, which was memorialized in the equipment list and advertising brochure. *See ETCO Corp. v. Hauer,* 161 Cal.App.3d 1154, 1158, 208 Cal. Rptr. 118 (1984) ("if an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation *until such future agreement*") (emphasis added).

Finally, for similar reasons, had the auction agreement been breached on January 8, 1990, the fact of damages could have been ascertained. The contract provided that Western was to receive a 10% commission on all items sold at the auction, and the items to be sold could have been determined by reference to the equipment list and advertising brochure. The value of these items could then have been determined by reference to the "Blue Book" or other reliable evidence of fair market value. This would have been sufficient information to have enabled a court to conclude that the fact of damages had been established.

In sum, plaintiffs' position that a contract is not enforceable until all terms of the con-

tract are finally and specifically determined is inconsistent with the modern trend favoring enforcement of contracts. *See Okun,* 203 Cal.App.3d at 817, 250 Cal.Rptr. 220. Were the court to adopt plaintiffs' argument, no agreement would ever be enforceable prior to full performance by both parties. California law does not require such precise certainty in order for a contract to be enforceable and damages to be ascertained. *See Robinson & Wilson, Inc. v. Stone,* 35 Cal.App.3d 396, 407, 110 Cal.Rptr. 675 (1973). Accordingly, the court rejects plaintiffs' argument that the levy was invalid because the auction agreement created no state-law property interest to which the levy could attach.

**b. Was Western's obligation to Hatfield fixed and determinable as of January 8, 1990?**

Plaintiffs next argue that, assuming the agreement created a valid property interest under California law, the levy was nevertheless invalid because Western's obligations to Hatfield under that agreement were not fixed and determinable, within the meaning of 26 U.S.C. § 6331 and Treasury Regulation § 301.6331–1(a)(1), as of January 8, 1990. This argument contains three subsidiary arguments, addressed below.

First, plaintiffs argue that the levy did not reach a fixed and determinable obligation because the auction agreement was not "the contract that generated the proceeds that purportedly could be the subject of the levy" in the first instance. Pls.' Post–Trial Brief at 6:7–8. Rather, say plaintiffs, the auction agreement was simply a service contract and not a contract for the sale of property. Plaintiffs contend that the contracts that generated the proceeds, and the only contracts that were subject to levy, were the "memoranda of sale" provided for in the auction agreement, i.e. the individual contracts of sale entered into between Western and the various buyers who attended the auction. Therefore, plaintiffs assert, since these contracts did not become fixed and determinable (indeed, did not even come into existence) until the day of the auction, some ten days after the levy was served, the levy could not have reached fixed and determinable obligations within the meaning of 26

U.S.C. § 6331 and Treasury Regulation § 301.6331–1(a)(1).

Defendant counters that plaintiffs' argument "improperly minimizes the statutory reach of the federal tax levy power." Def.'s Post–Trial Opp'n and Reply Brief at 2:4–5. Defendant contends that Hatfield had a right under the auction agreement to receive payment of the auction proceeds from Western, and the fact that the individual sales contracts were necessary to generate the auction proceeds in no way affected this right. Therefore, defendant asserts, the levy reached fixed and determinable obligations when it was served.

The plain language of 26 U.S.C. § 6331 and Treasury Regulation § 301.6331–1(a)(1), quoted *supra*, supports defendant's argument. These sections provide that a federal tax levy reaches all property and rights to property of the taxpayer that exist as of the date of the levy, regardless of whether the right to receive payment may be deferred until a later date. On January 8, 1990, the date on which the levy was served, Hatfield had an existing right under the auction agreement to receive payment from Western of all proceeds generated at the auction on January 18, 1990. The fact that Hatfield's right to receive these proceeds could not be effectuated until the buyers entered into individual sales contracts with Western is irrelevant to the analysis of whether Hatfield's right to receive payment (or Western's obligation to perform) under the auction contract was fixed and determinable. Therefore, plaintiffs' argument is rejected.

■ Plaintiffs next argue that because the auction agreement created an agency relationship between Western and Hatfield, either party could have terminated this agency relationship at any time prior to full performance of the contract. *See* Cal.Civ.Code §§ 2355(d) and 2356(a)(1). Therefore, plaintiffs assert, Western did not have a fixed and determinable obligation to Hatfield until the day of auction, when the auction agreement had been fully performed.

Plaintiffs correctly note that Western was Hatfield's agent[12] and that an agency relationship "may be renounced by either the principal or the agent at any time." *Woolley v. Embassy Suites, Inc.*, 227 Cal.App.3d 1520, 1529–30, 278 Cal.Rptr. 719 (1991). However, it does not necessarily follow that the auction agreement therefore created no fixed and determinable obligations prior to the auction date. The mere fact that a principal or agent has a right to terminate the agency at will does not mean that an agency contract creates no enforceable obligations prior to full performance of the contract. Rather, an agency contract is construed like any other and either party is entitled to damages for breach of contract. *See id.* at 1530, 278 Cal.Rptr. 719.

Here, the important point is that as of January 8, 1990, neither Hatfield nor Western had terminated the agency relationship, and Western therefore was under a contractual obligation to sell Hatfield's equipment at an auction on January 18, 1990 and to turn over the proceeds, less a 10% commission, to Hatfield thereafter. Thus, the fact that Hatfield or Western could or might have terminated the agency relationship thereafter is irrelevant.

■ Finally, plaintiffs assert that, under the relevant case law, a wholly executory bilateral promise to render future performance cannot create fixed and determinable obligations to the taxpayer within the meaning of 26 U.S.C. § 6331 and Treasury Regulation § 301.6331–1(a)(1). Therefore, say plaintiffs, because Hatfield had not substantially performed its obligations under the contract, Western therefore was under no obligation to Hatfield whatsoever. As support for this argument, plaintiffs again point to the undisputed facts: (1) no "Schedule A" was attached to the agreement describing what specific property was to be sold at the auction; (2) the final lot list of what property was to be offered for sale at the auction was not prepared until the day before the auction; (3) Hatfield's basic equipment list, prepared about one month prior to the auction, did not list many of the items ultimately

---

12. *See* 2 Witkin Summ. of Calif.Law, 9th ed., § 247; Cal.Civ.Code § 2362 (under California law, an auctioneer is considered an agent of his employer or principal).

offered for sale at the auction, such as office and computer equipment; (4) likewise, the advertising flier prepared and circulated about three weeks prior to the auction did not list many of the items ultimately offered for sale, listed other items that were *not* offered for sale, and included a number of items that were not Hatfield's; and (5) up until the day before the auction, Hatfield was constantly moving equipment in and out of the auction yard.

Defendant counters that the proper test for fixed and determinable is not whether the contract is "executory," but rather "whether the contract obligations owed to the taxpayer at the time of the levy are enforceable by the taxpayer." Def.'s Post–Trial Brief at 10:6–7. If the obligations are enforceable, says defendant, then they are by definition fixed and determinable. Moreover, defendant argues, even assuming that plaintiffs correctly state the test for fixed and determinable, the auction contract was not wholly executory as of the date of the levy and Hatfield had substantially performed its obligations under the contract.

The legal test for determining whether an obligation is fixed and determinable within the meaning of 26 U.S.C. § 6331 and Treasury Regulation § 301.6331–1(a)(1) is a matter of first impression in the Ninth Circuit. The only case even remotely on point, *Seaboard Surety Co. v. United States*, 306 F.2d 855, 859 (9th Cir.1962), supports defendant's position. *Seaboard* held that two federal tax liens automatically attached to an executory construction contract entered into between the taxpayer and the federal government, and that the liens were therefore entitled to priority over the interests of subsequent creditors, to which the taxpayer had assigned his interests in the contract. In so holding, the court stated that "[t]he fact that taxpay-

er's rights under the contract were dependent upon its performance did not affect the tax liens, as far as defendant creditors are concerned." *Id.; see also Randall v. H. Nakashima & Co., Ltd.,* 542 F.2d 270, 275 (5th Cir.1976) (citing *Seaboard* for the proposition that a federal tax lien may attach to contractual interests that are wholly executory and contingent upon performance of the taxpayer's contractual obligations).

Although *Seaboard* interprets the "all property and rights to property" clause in the federal tax lien statute,[13] section 6331 contains the same operative language.[14] Thus, *Seaboard* is indirectly applicable to the instant case because it involved the same ultimate question, i.e. whether the IRS liened or levied upon "property or rights to property" of the taxpayer within the meaning of the federal lien or levy statutes. Therefore, under *Seaboard,* the IRS' levy is valid regardless of whether the auction agreement was executory or not.

Nevertheless, an argument can be made that *Seaboard* is inapposite because it did not address the predicate question, applicable only to levies, whether the taxpayer's rights to property consisted of "fixed and determinable" obligations to the taxpayer pursuant to Treasury Regulation § 301.6331–1(a)(1). Assuming for the sake of argument that *Seaboard* is not controlling here, the relevant case law supports plaintiffs' argument that an *entirely* executory contract creates no fixed and determinable obligations under section 301.6331–1(a)(1). *See J.A. Wynne Co., Inc. v. R.D. Phillips Constr. Co., Inc.,* 641 F.2d 205, 208–09 (5th Cir.1981); *United States v. Murray,* 640 F.Supp. 89, 90 (E.D.Tenn.1986).

■ However, the court does not agree that the undisputed facts in this case demon-

---

**13.** The federal tax lien statute, 26 U.S.C. § 6321 provides:

[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

**14.** The primary distinction between a tax lien and a tax levy is that a lien continues in full force

and effect until the tax liability is extinguished, 26 U.S.C. § 6322, and automatically attaches to any "property owned by the delinquent [taxpayer] at any time during the life of the lien," whereas a tax levy only extends to the property owned by the taxpayer as of the date of the levy. *Glass City Bank v. United States,* 326 U.S. 265, 268–69, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945). This distinction is not pertinent to the case at bar.

strate that the auction agreement was wholly executory on the date the levy was served. To the contrary, as discussed at length *supra*, Hatfield had substantially performed under the contract and Western had begun its bargained-for performance. Hatfield had delivered an equipment list and had made its equipment available to Western. Western had circulated an advertising brochure and had spent $2,000 cleaning Hatfield's equipment. Both parties understood that a majority of the items on the equipment list were to be sold at the auction. It is true that the *exact* items to be sold and the price obtained for each was not determined until the day of the auction, about ten days after the levy was served. However, there need not be a specific sum due and owing to the taxpayer under the contract as of the date of the levy, so long as the taxpayer has rendered some performance. *See J.A. Wynne*, 641 F.2d at 208–09 (levy on construction contract valid even though taxpayer's right to progress payments had not yet accrued because, as of the date of the levy, there was no evidence that the taxpayer was in default under the contract); *Murray*, 640 F.Supp. at 90 (contractual obligation fixed and determinable even though no specific sum due and owing taxpayer as of date of the levy and even though taxpayer's right to payment had not yet accrued, because taxpayer had fully performed her obligations under the contract).

Here, on account of Hatfield's substantial performance of its contractual obligations as of January 8, 1990, Western was thereby obligated to sell a majority of Hatfield's equipment and remit the proceeds, less a 10% commission, to Hatfield. Thus, even though the amount of Western's obligation to Hatfield had not been reduced to a sum certain, it was nevertheless fixed and determinable within the meaning of Treasury Regulation § 301.6331–1(a)(1). Therefore, plaintiffs' argument to the contrary must fail.

In sum, the levy was valid because, on January 8, 1990, the auction agreement was enforceable under California law and because Western's obligations to Hatfield under that agreement were fixed and determinable.

Therefore, the auction proceeds check was an involuntary payment since it was made pursuant to a valid levy. *See Technical Knockout Graphics*, 833 F.2d at 802.

### 2. Hatfield's alleged exercise of dominion and control.

▮ As an alternative argument, plaintiffs contend that, even assuming the payment was involuntary, Western's delivery of the first auction proceeds check to Hatfield enabled it to exercise sufficient dominion and control over the check to convert it into a voluntary payment. Furthermore, say plaintiffs, the fact that Hatfield gave the check back to a Western representative after designating it to trust fund liabilities did not convert the payment back into an involuntary one because the Western representative effectively became Hatfield's agent for purposes of delivering the check.[15] Defendant replies that Hatfield could not possibly have exercised dominion and control over the auction proceeds check because it was a two-party check.

The court agrees with defendant. Even though a Western representative gave Jacklyn Tull, acting as a representative of Hatfield, actual possession of the check, Hatfield did not exercise dominion and control over that check because Hatfield could not have negotiated the check without the IRS' signature.

### 3. Defendant's other arguments concerning the auction proceeds check.

In light of the court's conclusion that the auction proceeds check was an involuntary payment, it need not address defendant's alternative arguments concerning the involuntary nature of the payment. Nor need the court address defendant's argument concerning the amount of the refund to which plaintiffs would be entitled if it had found the payment to be voluntary.

### C. Miscellaneous Issues.

### 1. Modification of court's partial summary judgment order.

In its opening post-trial brief, defendant requested that the court amend its order

---

**15.** Plaintiffs note that, under this analysis, defendant's remedy would be to proceed against West-

ern for failing to honor a levy under 26 U.S.C. § 6332(d).

(filed August 2, 1991) on the parties' cross-motions for summary judgment, in which the court granted plaintiffs' motion for summary judgment in part and ordered that $69,591.31 credited to the 100% penalty assessment against plaintiff Jacklyn Tull. Defendant argued that the court erroneously applied these payments directly to the 100% penalty because, pursuant to certain accounting practices of the IRS, application of payments to trust fund does not necessarily result in a dollar-for-dollar reduction in the 100% penalty.

In its supplemental post-trial brief, defendant concedes that the substantive effect of the court's order on the judgment in this case has been rendered moot by the parties' stipulation filed August 13, 1993.[16] Nevertheless, defendant requests amendment of the order to clarify the record. The court declines to amend its summary judgment order at this late date. The stipulation and this order adequately clarify the record.

## 2. Whether plaintiff Jacklyn Tull willfully failed to pay taxes during the first quarter of 1989.

Defendant also argues that "[b]ecause the trial record establishes that sufficient funds were received by Hatfield Trucking in the second and third quarters [of 1989] ... to fully pay the first quarter liability, she is liable for all three quarters." Def.'s Post–Trial Brief at 16:7–11. According to defendant, "[i]f a responsible person becomes aware that a prior period trust fund tax has not been paid, and sufficient funds are received to pay the liability of the prior period, and those funds are not applied solely to the unpaid taxes, then the responsible person becomes willful and liable for the prior period." Def.'s Supp. Post–Trial Brief at 6:8–13.

The problem with this argument is that it requires the court to make findings of fact which are only appropriate for jury resolution. Because the special verdict did not ask the jury to find the predicate facts necessary to address defendant's argument, the court is unable to rule on this issue.

## 3. Whether plaintiff James Tull's wages are subject to levy.

▆ Plaintiffs argue that defendant may not levy on plaintiff James Tull's wages to satisfy the 100% penalty.[17] Plaintiffs concede that the general rule in California is that community property may be used to satisfy one spouse's separate debt. *See* Cal. Fam.Code § 910(a).[18] Nevertheless, they contend that an equitable exception to the general rule should be applied here because plaintiff Jacklyn Tull's debt did not benefit the community. In support of this proposition, plaintiffs cite an unpublished Idaho District Court opinion.

As defendant points out, however, an Idaho District Court opinion has no relevance to this community property issue, which is governed exclusively by California law. The unqualified plain language of California Fam-

16. The parties' stipulation reads in pertinent part as follows:
  [t]aking into account all issues determined at trial and before trial herein, including the partial summary judgment in favor of plaintiffs, the partial concession as to the application of the federal tax deposits, and the jury determination that one contested federal tax deposit was in fact paid, the unpaid trust fund liability of Hatfield Trucking Services, Inc. for the first, second, and third quarters of 1989 was $112,-142.90....
  Should the United States prevail on all post-trial issues, it will be appropriate to enter judgment in favor of the United States in the amount of $112,142.40, with interest at the statutory rate from January 18, 1990, less the amounts previously collected from plaintiffs by the Internal Revenue Service and applied to the 100% penalty.
Stip. Re Acct'g Effects of Verdict and Post–Trial Issues, filed Aug. 13, 1993.

In a subsequent stipulation, the parties agreed that the amounts previously collected by the IRS and applied to the 100% penalty totalled $19,-125.91. Stip. Re Tax Payments Re Jacklyn Tull, filed Jan. 11, 1994.

17. Both parties agree that plaintiff James Tull's wages are community property and the 100% penalty assessed against plaintiff Jacklyn Tull is her separate debt.

18. This section provides:
  [e]xcept as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt.

ily Code § 910(a) does not support plaintiffs' argument, and plaintiffs have failed to cite any California law establishing the existence of a judicial exception to this statute based on a separate debt's alleged lack of benefit to the community. In any event, plaintiffs' argument is incorrect as a factual matter, because plaintiff Jacklyn Tull's willful failure to pay Hatfield's corporate taxes did benefit the community by enabling her to withdraw corporate funds for her own salary in preference over the debt owed to the United States. For these reasons, plaintiffs' argument is rejected.

**IV. Conclusion.**

In conclusion, by reason of the foregoing, and taking into consideration all other issues determined before, during and after trial, including the partial summary judgment in plaintiffs' favor, defendant's concession as to four of the five tax deposits, the jury's verdict, and the parties' stipulations filed on August 13, 1993 and January 11, 1994, judgment shall be entered in favor of defendant in the amount of $92,029.94 ($112,142.90 minus $987.05 minus $19,125.91), with interest to be calculated as provided in the stipulations filed August 13, 1993 and January 11, 1994, less any remaining amounts previously collected from plaintiff Jacklyn Tull and/or plaintiff James C. Tull by defendant and applied to the 100% penalty.

IT IS SO ORDERED.