Filed 2/21/24  Watters v. Cannon CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ANDREW G. WATTERS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>BENJAMIN P.D. CANNON et al.,<br><br>Defendants and Respondents. | A168259<br><br>(San Francisco City & County<br>Super. Ct. No. CGC20586215) |

Plaintiff Andrew G. Watters appeals from a judgment issued after a bench trial on a multi-cause of action complaint he brought against defendants Lady Benjamin P.D. Cannon and 6x7 Networks, LLC (6x7), an entity owned and operated by Cannon (collectively, defendants).  The court's judgment was mostly in favor of defendants.  We see no error and affirm.

## I. BACKGROUND

In August 2020, Watters, a lawyer who appeared pro se in the trial court as he does in this appeal, filed a complaint against defendants.  Watters alleged nine causes of action, but only six causes of action survived and made it to trial:  fraud; breach of contract; declaratory relief; wage theft/PAGA; false advertising; and unfair competition.  Watters sought rescission of all the contracts he outlined in the complaint, special, general, and punitive

1

damages, injunctive relief, the placement of 6x7 in a receivership, restitution, and attorney fees and costs.

Defendants filed an answer denying virtually all of Watters's material allegations and opposing any relief on any cause of action. They did not file a cross-complaint.

In April 2023, the trial court conducted a bench trial. Watters and Cannon were the only witnesses. Their testimony and the documentary evidence they introduced concerned numerous transactions between Watters, 6x7, and Cannon.

## A. *The Contracts Between the Parties*

Watters entered into several contractual agreements with 6x7, including the following:

- A written March 2019, five-year colocation contract that called for Watters to pay a $1,500 non-recurring charge and $800 a month over five years for use of a colocation facility located in San Mateo, California;

- a January 2020 fiber internet service contract (fiber contract) for service to Watters's new office space;

- an agreement that Watters would act as a sales representative for 6x7, which Watters testified he entered into "at least five or six months" after the colocation contract, and pursuant to which he sent out a number of inquiries to prospective customers; and

- a June 2, 2020, agreement to become 6x7's "Chief Legal Officer" (CLO agreement), consisting of a June 2, 2020 email from Watters to Cannon and Cannon's email response on the same date; in the same email, Watters also proposed that he hold the position of "Director of 6x7 Labs."

Watters also entered into a written June 15, 2020 joint venture agreement with Cannon regarding VirtuaScribe, "an innovative online

platform" that would provide the public with "an oncall expert database of subject matter experts with a click to book-type ordering system."

Watters also testified that in June 2020, Cannon, while hospitalized, gave him power of attorney for matters involving 6x7, along with another 6x7 employee, so that they could try to manage 6x7's business during her illness. It was rescinded when Cannon returned to the business.

Watters contended that he rescinded by email all of his contracts with 6x7 and Cannon and removed his equipment from the 6x7 colocation facility he was then using in San Francisco in late July 2020. In his email, Watters referred to Cannon's taking time off from work and having health issues and then wrote, "Due to your erratic behavior and unreliable health, I cannot trust 6x7 as my telecom provider, especially not for the cloud-type, 100 percent uptime services that I am very close to providing to several customers of my law practice management system."

Watters indicated in his email that before he removed his computer equipment from the San Francisco facility, apparently doing so the same day he sent the email, he was always concerned about the risk of vandalism to the facility, which was not secure. He then stated, "I am giving you notice under our contracts that I am rescinding all of our agreements . . . . I have removed all of my equipment from your [San Francisco] facility . . . ." Among other things, he went on to state that the San Francisco facility was inconsistent with the representations made on 6x7's website and by Cannon before Watters signed the colocation contract, and he "resigned" from his CLO position.

Watters also wrote that he was owed $14,383.56 for 42 days of work and $5,000 for his payment on the fiber contract for a total of $19,383.56. He stressed that his action was "not personal in any way" and that he considered

3

Cannon's efforts to be "admirable." But, "[t]he bottom line, you have had a full and fair opportunity to deliver what we agreed and you didn't deliver, nor did you honor our employ [*sic*] agreement. That is enough for me to cut my losses."

### B. *Watters's Case*

Watters testified that he was a practicing lawyer based in Redwood City, where he owned a small law firm consisting of four attorneys, a law clerk, and an administrative professional. His appeal focuses on his challenges to the trial court's rulings regarding the colocation contract, including his fraud claim, and the CLO Agreement. We limit our discussion of the proceedings below and the evidence to those rulings.

Regarding the colocation contract, Watters sought damages for fraud and breach of contract, and a declaration that the contract was rescinded.[1] He testified that he first contacted 6x7 and Cannon in April 2018 about its colocation services, apparently by responding to a Craigslist posting asking for help finding colocation clients. In March 2019, he entered into the colocation contract with 6x7 for his use of a San Mateo colocation facility, but the company later switched him to a San Francisco facility because the San Mateo facility was not ready. Although this change was an inconvenience to him, he "ultimately accepted that provision."

Watters testified that he went to the San Francisco facility in December 2019 and was "very shocked. This was a converted residential building with ground floor retail, not an actual data center. . . . [¶] [I]t was clear that the facility was a lot different from what I had been led to believe."

---

[1] Although Watters sought damages for breach of the colocation contract, the parties litigated the issue and the court ruled on it, the breach of contract cause of action in his complaint appears to have been directed at the CLO agreement.

4

The ground floor was "a very messy open office" with equipment and parts everywhere, a bed and bathtub, no elevator, and "rickety" stairs to the downstairs that he had to use to carry his equipment. The downstairs was a "converted basement" and his assigned cabinet "was in the center of a partitioned-off area with a portable air conditioner running and cables everywhere." Nonetheless, he "decided to give Lady Ben and 6x7 a chance" because, he testified, "I had already paid the nonrecurring charges . . . and I had nowhere else to put my equipment, and I wanted to get it turned on ASAP."

Watters contended that 6x7 and Cannon misrepresented numerous things about 6x7's colocation facility. He claimed, for example, that (i) at the time of contracting the data center had not been built and would not have the represented features when built; (ii) as built, the facility was only a converted basement in a tiny apartment building with ground floor retail in San Francisco and not in San Mateo; (iii) at the time of contracting, defendants were in default of their data center lease, had no right to occupy the premises, and had no option to purchase the apartment building; (iv) defendants had no way to perform the full contract; (v) a third party provided the internet service contracted for rather than defendants; and (vi) the cabinet for Watters's computer equipment at the San Francisco facility did not have redundant electrical power, and (vii) the facility was plugged into an illegal and unsafe power tap rather than a properly metered connection, which resulted in Watters experiencing "at least" three outages, one for minutes and two for hours, in mid-2020. Watters also was concerned about the hazards presented by the San Francisco facility's location in a place prone to vandalism, its lack of security, and its lack of regular around-the-clock access.

5

Watters further contended that the CLO contract was an employment agreement. In his June 2, 2020 email, Watters proposed to Cannon "how we might work together," and proceeded to outline his proposed "Executive" position of "Chief Legal Officer." His duties would be to "[s]upervise the company's legal affairs, including: (1) conducting investigations, (2) managing outside counsel handling litigation matters, (3) assembling and reviewing transactional documents such as corporate contracts, (4) ensuring compliance, and (5) handling infrastructure security." He would work only up to 20 hours per week, 90 percent of which would be remote, explaining this was "due to my multiple other business ventures and my need to continue those ventures from my existing office in San Mateo. I also live in San Mateo and it's a big production going to [the San Francisco facility] whenever I do go, due to parking challenges and otherwise."

As for compensation, Watters proposed that, since 6x7 was "not doing stock options," he be paid "a base salary of $125,000 per year paid twice monthly, plus a deferred portion of $125,000 per year that is paid at the conclusion of the first year that the company makes at least $10 million in gross receipts." He stated, "This executive role works out to at least 1,000 hours of service per year for $125k which is $125/hr., or about one-third of what I would otherwise charge." He proposed to delay payment of his compensation for up to two months while Cannon completed "the Bahrain deal." He further stated, "For outside purposes other than taxes, the salary would be $250,000 per year (so if I buy a house for example, that would be the salary the company would certify, but my W-2 would say $125,000 unless more is actually paid). That way I'm not taking steps back in terms of my earnings, and the risk is acceptable to me in light of the potential payoff of an extra $125k per year for a half-time job."

6

Cannon's email reply to Watters's email was as follows: "Hey Andrew, this is awesome, exactly along the lines and numbers I was thinking, a great deal for both of us! I accept! [¶] If you want to formalize it more competent [*sic*] please feel free, otherwise, let's just roll right into business together!"

According to Watters, he worked for 42 days as CLO, earning $14,400 in salary, but he was never paid. He contended that, to the extent he had a client in this scenario, it was 6x7. In his closing trial brief, Watters contended that he resigned as CLO in mid-July 2020 because defendants were committing "wage theft" against approximately 20 employees, which he told Cannon was illegal, and because of "other reasons."

Watters contended he was entitled to damages as follows: regarding the colocation contract, $97,000 plus interest for fraud by both defendants, and the same amount for breach of contract by 6x7; for wage theft, $14,400, plus waiting penalties and interest, against both defendants; for his conversion claim regarding the fiber contract, $5,000 plus interest against 6x7 (an amount also included in the fraud and breach of contract causes of action); plus punitive damages and attorney fees.

C. *Defendants' Case*

Defendants contended that Watters had failed to prove any of his claims regarding the colocation contract. They emphasized that Watters's first inquiry about colocation services was an email in response to a Craigslist post seeking help for 6x7 in finding colocation clients rather than an advertisement for services. Further, Cannon stated in her email response to Watters' inquiry, "We haven't officially launched yet, so no site."

Defendants also emphasized that Watters inspected the San Francisco facility in December 2019, after the parties entered into the colocation contract and before he moved in his equipment, and that he testified it was a great disappointment. Yet there was no evidence that he complained at the

7

time about the facility or attempted to rescind his agreement. To the contrary, he continued using the service *and* entered into other agreements with 6x7, including to become its CLO.

Further, defendants pointed out, Watters admitted at trial that the colocation connectivity provided by 6x7 was satisfactory. Cannon testified that Watters sent her "a speed test and said [he was] very happy with the quality of services." Also, Cannon testified that any outages Watters experienced were not the fault of 6x7.

Defendants contended that Watters did not prove any of the misrepresentations he alleged had actually occurred, but showed only that he did not like the "look" of the data center as compared to the stock photos, or "clip art," used in 6x7's materials.

As for the CLO agreement, defendants denied that it made Watters an employee of 6x7. They pointed out that Watters, while CLO, maintained a separate and active law practice with his own employees, did not notify the State Bar of any change of employment or location, and never signed any employment-like documents, such as an I-9 form or a payroll deduction declaration. Also, he had a colocation contract when he proposed to act as 6x7's CLO but never obtained Cannon's informed legal consent to represent it in light of this conflict of interest as required by the Rules of Professional Conduct.

### D. *The Trial Court's Statement of Decision*

The trial court issued a statement of decision in which it ruled in favor of defendants, except that it stated it was ordering 6x7 to return to Watters the $5,000 he had paid for the fiber network and was issuing a declaratory judgment "voiding" (by which the court presumably meant granting Watters's request for a declaration of rescission) the VirtuaScribe joint venture "deal."

8

The court first found that Cannon was "not always reliable." On direct, she was "often evasive," and she was "unpersuasive" on "peripheral issues," such as her "Scottish title," some of her work history, and certain other portions of her testimony.

The court found Watters to be "unreasonably animated by strong personal interests, such as revenge." The court described him as follows: "One is reminded of the self-represented lawyer in *Clarity Co. Consulting, LLC v. Gabriel* (2022) 77 Cal.App.5th 454, 458 (self-represented lawyer had 'tunnel vision'). Despite his claim that he represented 6x7 and that it was 'indistinguishable' from 6x7 founder Lady Benjamin, he maintains a 'hall of shame' on his website featuring the defendants, despite his continuing duty of loyalty. . . . He claims fraud and misrepresentation even though after he putatively discovered the falsity of defendants' misrepresentations, he continued to work for them, indeed solicited 6x7's legal business, and offered to sell 6x7's services."

As for Watters's fraud and breach of contract claims regarding 6x7's colocation services, the court found that "the representations claimed to be misleading could not have been material, because (a) connectivity was satisfactory and (b) long after he discovered the truth Watters continued to do business with the defendants, and even signed up to sell their services to third parties. Second, no damages were proven: Watters got the service, and no damages were attributed to e.g. the outages or the location in San Francisco as opposed to San Mateo. (In any event, Watters ultimately agreed to the San Francisco location.)"

Regarding the CLO agreement, the court found that Watters was not an employee of 6x7 because "[h]e was acting as a member of his own firm which he ran at the time. There are no attributes of employment. He was

9

not subject to the direction of 6x7, did not use its support staff, and the kinds of work done is [*sic*] generally provided by outside counsel. Even Watters' . . . argument based on *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 [(*Borello*)] shows the relationship was not that of employment."

The trial court also noted that, according to Watters, the parties knew the agreement was illegal, apparently referring to Watters's contention that his deferral of compensation for two months was against the law. Further, the court, noting that Watters indicated he was aware of his fraud claim when he began his legal representation of 6x7 in July 2020, concluded this legal representation violated a rule of the California Rules of Professional Conduct that prohibited representation when the lawyer had a business interest with the client, absent written informed consent. It also noted that Watters had not sent a notice of the right to arbitrate a fee dispute to 6x7, although it did not rely on this fact in its decision.

The court concluded, "For all these reasons I decline to enforce an 'employment' agreement here."

The court did not directly address Watters's declaratory relief and wage theft causes of action other than as part of the analysis we have already summarized. It did not directly address Watters's false advertising and unfair competition causes of action other than to state that they were based on the claims already addressed by the court, and that the court was finding for defendants for the reasons it had already stated.

Subsequently, the trial court issued a judgment for Watters for $5,000 on his conversion cause of action[2] and for defendants on the remaining causes of action.

Watters filed a timely notice of appeal.

## II. DISCUSSION

### A. *Watters's Colocation Contract Claims Lack Merit*

On appeal, Watters largely repeats his contentions below that the trial court should have found defendants breached and defrauded him regarding the colocation contract, entitling him to damages, which he argued below were one amount for both claims. His arguments lack merit.

#### 1. Legal Standards

In order to prove fraud, a plaintiff must show " '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; see Civ. Code, § 1709 ["One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."].) "*All* of these elements must be present if actionable fraud is to be found; one element absent is fatal to recovery." (*Okun v. Morton* (1988) 203 Cal.App.3d 805, 828.)

A plaintiff's need to prove "actual reliance" is particularly relevant here. "A misrepresentation of fact is material if it induced the plaintiff to

---

[2] Contrary to the court's reference in the judgment to Watters's conversion cause of action as his sixth, the trial court stated in its statement of decision that Watters dismissed his "fifth, sixth and seventh causes of action," and that these causes of action were "no longer at issue." This discrepancy between the statement of decision and the judgment is not relevant to our resolution of this appeal and, therefore, we do not discuss it further.

11

alter his position to his detriment. [Citation.] Stated in terms of reliance, materiality means that without the misrepresentation, the plaintiff would not have acted as he did." (*Okun v. Morton*, *supra*, 203 Cal.App.3d at p. 828.) In other words, "[a]ctual reliance occurs when a misrepresentation is ' "an immediate cause of [a plaintiff's] conduct, which alters his legal relations," ' and when, absent such representation, ' "he would not, in all reasonable probability, have entered into the contract or other transaction." ' [Citations.] 'It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.' " (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976–977.)

As for a "material" term of a contract, it is "a 'contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done.' [Citation.] 'Whether a term is "essential" depends on its relative importance to the parties and whether its absence would make enforcing the remainder of the contract unfair to either party.' " (*Westlands Water District v. All Persons Interested* (2023) 95 Cal.App.5th 98, 127, italics omitted.)

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable

12

inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

"[T]he testimony of a single witness, even a party, may alone constitute substantial evidence. [Citation.] And absent an express credibility finding, we must infer the trial court resolved questions of credibility in a manner that supports its findings and order. [Citation.] 'We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value.' " (*Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257.)

### 2. Analysis

Watters contends the court "erred in its reasoning that [Watters] could not have been defrauded because he didn't discover [defendants'] fraud immediately. The trial court's reasoning conflated the advertising fraud and the colocation data center fraud perpetuated on [Watters]." He contends 6x7 and Cannon's misrepresentations and failure to deliver on what was promised also require that we reverse the trial court's rejection of his breach of contract claim.

Watters's arguments misapprehend the trial court's reasoning: the court did *not* reject his fraud and breach of contract claims for the reasons he asserts. Rather, as we have discussed, the court rejected these claims based on its findings that "the representations claimed to be misleading could not have been material, because (a) connectivity was satisfactory and (b) long after he discovered the truth Watters continued to do business with the defendants, and even signed up to sell their services to third parties. Second, no damages were proven; Watters got the service, and no damages were attributed to e.g. the outages or the location in San Francisco as opposed to

13

San Mateo. (In any event, Watters ultimately agreed to the San Francisco location.)"

Much of Watters's argument consists of his reciting of his trial contentions about defendants' purported misrepresentations. But under our substantial evidence standard of review, we uphold the court's ruling if it is supported by substantial evidence, " 'even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) For this reason, Watters's reassertion of his contentions at trial is unpersuasive.

Further, there is ample support in the record for the trial court's findings regarding both Watters's lack of reliance on, and the lack of damages resulting from, the purported misrepresentations. Regarding Watters's allegations of advertising and sales misrepresentations that induced him to enter into the colocation contract in March 2019, Watters himself testified that, despite being "very shocked" by the actual, purportedly inadequate conditions of 6x7's San Francisco facility when he visited it in December 2019, he "decided to give Lady Ben and 6x7 a chance" because, he testified, "I had already paid the nonrecurring charges . . . and I had nowhere else to put my equipment, and I wanted to get it turned on ASAP." He installed his equipment and, further, testified that the colocation connectivity provided by 6x7 was satisfactory, and Cannon testified that Watters sent her "a speed test and said [he was] very happy with the quality of the services."

After his visit to the San Francisco facility, Watters continued to contract for the colocation services for approximately eight months, until he sent a notice of rescission of all his contracts in late July 2020, without any evidence that he complained about misrepresentations to 6x7. To the

14

contrary, until late July 2020, Watters proceeded with several contractual arrangements with 6x7, for fiber network services, to sell its colocation services to his clients, and to act as its CLO, and he also entered into a joint venture agreement with Cannon.

This evidence supports the trial court's conclusion that any purported advertising and sales misrepresentations were not material to Watters, meaning that he did not actually rely on them in entering into the colocation contract. It also supports the trial court's rejection of Watters's breach of contract claim because it shows 6x7 did not breach any conditions Watters considered essential to the colocation contract.

The court's conclusion that there was no evidence of damages further supports its findings, particularly regarding Watters's contentions that he did not discover certain misrepresentations until June of 2020, such as the lack of redundant electrical power that led to certain power outages. Watters does not point to anything in the record that contradicts the court's no damages finding.

Watters also argues the trial court abused its discretion in treating Cannon's testimony as credible and in ignoring his, Watters's, testimony. This is an odd argument. Any factfinder is entitled to pick and choose the testimony of witnesses that it finds credible. (See *In re Ferrell* (2023) 14 Cal.5th 593, 605 [jurors "free to pick and choose those portions of evidence they found credible, ' "weaving a cloth of truth" ' from available materials"], citing *People v. Riel* (2000) 22 Cal.4th 1153, 1182 [jurors may believe the truth lies "somewhere in between" the differing testimony of witnesses]; *Estate of Gilliland* (1971) 5 Cal.3d 56, 60 ["trier of fact was not required to make a selection between the respective testimony of the witnesses on one side or the other in its entirety"]; and *People v. Robinson* (1964) 61 Cal.2d

15

373, 389 [jurors may "accept one portion of a witness's testimony while rejecting another"].) That is what trial courts do in making credibility determinations.

Watters further criticizes the trial court's finding that he was motivated by revenge and had "tunnel vision." According to Watters, the court's attention to his "motivations was irrelevant and only reveals the trial court's errors in disregarding his evidence." Watters offers no legal authority in support of his assertion, and we are not aware of any. He fails to appreciate that bias is always relevant to a factfinder's evaluation of credibility. (Evid. Code, § 780, subd. (f) [in evaluating the credibility of a witness, factfinder may consider "[t]he existence or nonexistence of a bias, interest, or other motive."]; *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 821 ["in evaluating credibility, the fact finder is . . . permitted to consider . . . the existence or nonexistence of a bias, interest, or other motive," citing Evid. Code, § 780, subd. (f)].)

## B. *Watters's CLO Agreement Claims Lack Merit*

Watters next contends the trial court erred in rejecting his contention that defendants breached his employment contract, the allegation which underlies his breach of employment contract and "wage theft" causes of action, because he was an employee of 6x7 under the test enunciated in *Borello, supra*, 48 Cal.3d 341. In his wage theft cause of action, Watters alleged that defendants refused to follow the law despite multiple warnings, and prayed for "a Private Attorney General Act injunction, receivership, and any other available penalties and remedies." But on appeal, he focuses on his claim that defendants breached the CLO agreement, an employment contract, by not paying him for 42 days of work he performed in June and July 2020.

16

As we have discussed, the trial court declined to enforce what Watters contended was an "employment" contract because it found Watters was not an employee of 6x7, since "[h]e was acting as a member of his own firm which he ran at the time. There are not attributes of employment. He was not subject to the direction of 6x7, did not use its support staff, and the kinds of work done is [*sic*] generally provided by outside counsel. Even Watters' . . . argument based on [*Borello, supra,*] 48 Cal.3d 341 shows the relationship was not that of employment."[3]

Watters first argues that the trial court, instead of following *Borello, supra,* 48 Cal.3d 341 as required under Labor Code section 2783, subdivision (c),[4] followed the "ABC" test, which was cited by defendants. This is incorrect. Here again, he misapprehends the trial court's reasoning. The only test the court referred to in its statement of decision was *Borello*. As for whether substantial evidence supports the trial court's rejection of Watters's contention that defendants breached an employment contract with him, first,

---

[3] As we have discussed, in its statement of decision, the trial court also referred to Watters's contention that his purported employment contract was illegal and also concluded that Watters's legal representation of 6x7 was a violation of a rule of the California Rules of Professional Conduct. In addition, it noted that Watters had not sent a notice of the right to arbitrate a fee dispute to 6x7; although the court did not rely on this in its decision, Watters nonetheless argues defendants waived their right to rely on this failure as an affirmative defense. In light of our conclusion that the court's rejection of Watters's breach of employment contract cause of action is supported by substantial evidence and the lack of any other cause of action by Watters in pursuit of recovery here, we do not address these additional aspects of the trial court's ruling regarding Watters's breach of employment contract claim.

[4] Labor Code section 2783, subdivision (c) states that "the determination of employee or independent contractor status . . . shall be governed" by *Borello* for "[a]n individual who holds an active license from the State of California and is practicing [as a] . . . lawyer . . . ."

17

Watters does not argue, and there is no evidence, that Cannon personally employed him. Nor is there any error on this issue with respect to 6x7.

The *Borello* court instructed that " '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . .' " (*Borello*, *supra*, 48 Cal.3d at p. 350.) However, "the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." (*Ibid*.) The *Borello* court listed " ' secondary' indicia" to consider, such as " 'the right to discharge at will, without cause,' " and "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Borello, supra*, 48 Cal.3d at pp. 350, 351.) These " 'individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Ibid*.)

There is substantial evidence to support the trial court's conclusion that Watters was not an employee of either Cannon or 6x7 under this multi-factor test. Watters approached Cannon about representing 6x7 when he was acting as a lawyer with his own law firm, which he ran at the time, and he worked out of his law firm office when acting as 6x7's CLO. Watters testified

18

that Cannon never went to his law office to supervise him; that she did not provide him with anything (such as a computer or office equipment) other than an email account to support his performance of his CLO duties; that he brought in two of his own employees to provide services to 6x7, paid for them, and provided them with such incidents of employment as a desk, phone, computer; that he had multiple other business ventures that he handled at his office; that he never notified the State Bar of a change in his record or address; that he continued to carry malpractice insurance in June 2020; that he had many cases pending in June 2020 with other clients; that 6x7 neither paid his phone bills nor provide him with any accruals of vacation or sick pay or other employment benefits; and that he did not recall keeping any time records for his 6x7 CLO work. Under the *Borello* test, this is more than enough to support the trial court's conclusion that he did not perform his work as 6x7's CLO as an employee.

Watters argues that he was planning to end his law practice as he transitioned to his role as an employee of 6x7. However, his trial testimony was somewhat different. He testified, "And I did have my practice in mid-2020, and, at that time, my intention was to transition *to a more part-time law practice role* so I could pursue my other business ventures, and a big component of that was joining 6x7 as an employee, but after that I ended up returning to a full-time law practice and have been ever since." (Italics added.) In other words, his own testimony is at odds with his appellate claim, and it could be reasonably inferred from it that he was going to continue with his law practice while he represented 6x7. This inference is further supported by the statement in Watters's June 2, 2020 email about "my multiple other business ventures and my need to continue those ventures from my existing office in San Mateo."

19

Moreover, although Watters contends it takes time to shut down a law practice, he does not identify any evidence indicating that he made any effort to wind down or otherwise limit his law firm activities, such as by giving notice to his employees or clients of his transition, at any time during the 42 days he purports to have worked as 6x7's employee. Further, as the trial court found, his work was of a kind that can be generally provided by outside counsel (according to the CLO agreement, supervising 6x7's legal affairs, conducting investigations, managing outside litigation counsel, dealing with transactional documents, ensuring compliance, and handling infrastructure security); there is no indication that Watters was under the direction of 6x7 in performing his legal work; and there is no indication that Watters used any of 6x7's support staff in performing this work.

Watters rehashes the evidence he contends shows he was an employee of 6x7, such as that he was present at 6x7's facilities on several occasions, and was required to attend "nearly daily" phone meetings, and further argues that working remotely was consistent with employee practices during the COVID-19 pandemic. But again, under our substantial evidence standard of review, we need not consider such contentions if substantial evidence supports the trial court's ruling.

Finally, Watters contends the trial court was wrong in concluding that 6x7 did not control his work as CLO, contending that Cannon's own testimony shows that she retained control over who Watters could hire to work under him and prevented him from contacting the City of San Mateo regarding the delayed fiber installation to his office. Neither contention is persuasive. As for the first, Watters cites to testimony by Cannon that he contends purportedly shows she retained control over his hires. However, in that testimony, Cannon actually stated, "Your staffing was your decision, not

mine." Asked whether she recalled interviewing one of Watters's employees before she was hired, Cannon said, "You wanted my opinion on her *for your firm*." (Italics added.) The trial court's ruling implicitly found this testimony credible. As we have previously discussed, we will not second-guess the trial court's determinations of what portions of Cannon's and Watters's testimony it found credible. (E.g., *In re Ferrell*, *supra*, 14 Cal.5th at p. 605.) And as for Cannon not allowing him to contact the City of Mateo, a client can limit the assignments of outside counsel retained for ongoing work as appropriate; moreover, it is not surprising that Cannon would not want Watters to represent 6x7 regarding possible causes of a delay in 6x7's fiber network service to *Watters* himself.

Given this evidence, together with the lack of evidence establishing reversible error, we have no reason to address the other contentions and arguments by the parties, nor to reverse the trial court's rejection of Cannon's breach of employment contract and wage theft claims.

### III. DISPOSITION

The judgment is affirmed. Defendants are awarded costs of appeal.

STREETER, J.

WE CONCUR:

BROWN, P. J.
SMILEY, J.*

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.